Filed 11/17/14  Certified for Publication 12/8/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MAYA L., A Person Coming Under the Juvenile Court Law. | B254628 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>ASHLEY L.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK96699) |

        APPEAL from an order of the Superior Court of Los Angeles County, Deborah Losnick, Juvenile Court Referee.  Affirmed.

        Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

        Richard D. Weiss, Acting County Counsel; Dawyn R. Harrison, Assistant County Counsel; and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

Ashley L. (mother) was arrested for child endangerment after her four-year old daughter, Maya L., fell from the trunk of a moving vehicle. Maya was subsequently declared a dependent child of the court pursuant to Welfare and Institutions Code section 300[1] and placed in the custody of her father, Aaron H. (father). At the six-month review hearing, the trial court terminated jurisdiction and entered a family law order providing father physical and legal custody of Maya. Mother appeals, arguing that the trial court applied the wrong legal standard at the six-month review hearing. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Initial Referral and Detention*

#### 1. *Events preceding the section 300 petition*

Mother and father lived in separate residences and shared custody of their daughter, Maya L., pursuant to family court order. On November 22, 2012 (Thanksgiving Day), the Los Angeles Department of Child and Family Services (DCFS) received a referral from law enforcement reporting that Maya, then four-years old, had been thrown from the trunk of a car. According to the referral, Maya's maternal aunt had been driving with mother while the child was seated in the rear of the vehicle. Mother was inebriated and began striking the maternal aunt in the head. The maternal aunt pulled to the side of the road and the three occupants exited the vehicle. When mother turned away, the aunt placed Maya in the trunk and drove away. The trunk opened while the vehicle was moving, causing Maya to fall. Responding officers arrested mother for public intoxication, child endangerment and assault. Mother was placed in a detention facility.

DCFS obtained a police report of the incident, which stated that the maternal aunt had been visiting Los Angeles. According to the aunt, she had driven mother and Maya to Thanksgiving dinner where mother consumed "multiple glasses of wine and was possibly sneaking additional hard alcohol." During the drive home, mother became

---

[1] Unless otherwise noted, all further statutory citations are to the Welfare and Institutions Code.

2

"belligerent and angry because she thought [the aunt] was too concerned with how much alcohol [mother] consumed. [Mother] was cursing and would not calm down." Mother eventually "exploded," striking the aunt in the head with a closed fist. Mother also bit aunt's arm, which left a visible mark, and pulled the aunt's head back by her hair. The aunt then pulled the car over to let mother out of the vehicle. Mother unbuckled Maya and intended to leave with the child on foot. The aunt, who was concerned for Maya's safety, attempted to place the child back in the car while mother was distracted. The mother, however, saw what was occurring and attempted to intervene. The aunt then placed Maya in the trunk, believing she could drive a short distance and then retrieve the child from the trunk once they were away from mother. However, as the car pulled away from the curb, the trunk opened and Maya fell on to the ground. An undercover officer observed the events and immediately pulled over the aunt. Maya scraped her knee, but was otherwise uninjured.

Mother got into an altercation with responding officers, scratching one officer in the face before being pulled to the ground by other officers while screaming "'fuck you [aunt] this is your fault.'" During an interview with the aunt, an officer observed a large patch of her hair fall to the ground. Mother was arrested and placed in custody. Maya was examined by paramedics and later released to father.

DCFS interviewed Maya at the police station. The child reported that mother was yelling "'at my auntie . . . [and] was very mad'" because the aunt had said some "'bad things'" about mother. Maya further reported that "'[t]hey were arguing about all the drinks they drank all day.'" According to Maya, mother drank "'a lot and grandma gets mad because [mother] drinks.'" Maya denied ever being abused or touched inappropriately.

DCFS also attempted to interview mother at the police station. Mother appeared to be intoxicated and was very upset that the aunt had not been arrested. Mother became belligerent, kicking the cell door and demanding that she be provided a phone call. DCFS terminated the interview "due to the mother's uncooperative behavior . . . and

being intoxicated." During a second interview the next day, mother denied having any issues with alcohol and reported that she suffered from severe depression.

DCFS also met with father, who had traveled to the police station to take custody of Maya. Father told the social worker this was not mother's first incident involving alcohol, explaining that she "gets drunk" and had been previously admitted to the hospital after maternal grandmother (grandmother) found her "passed out." Father reported that Maya was the subject of an open family court matter and that he was willing to take full custody of her.

Several days after mother's arrest, DCFS interviewed Maya's grandmother, who denied the referral allegations against mother and denied mother had any alcohol issues. The grandmother admitted, however, that mother had been taken to the emergency room two years earlier because she had "passed out from alcohol use."

### 2. *Section 300 petition and detention*

On November 28, 2012, DCFS filed a petition alleging Maya fell within the jurisdiction of the juvenile court pursuant to section 300, subdivisions (a) and (b). The petition included an identical allegation under each subdivision asserting that mother "failed to protect the child in that the mother continued to physically assault the maternal aunt, while the maternal aunt was driving with the child as a passenger in the vehicle. Such violent conduct . . . endangers the child's physical health and safety . . ." The petition included two additional allegations under subdivision (b) asserting that that mother had a "history of substance abuse" and suffered "mental and emotional problems" that "rendered her incapable of providing regular [or adequate] care" to the child. The petition did not include any allegations pertaining to father.

In support of the petition, DCFS filed a detention report summarizing its initial investigation. DCFS recommended that the court order the child to remain placed with father and provide mother monitored visits. The report also recommended services for mother, including parenting classes, substance abuse treatment and individual therapy.

4

At the detention hearing, the court made findings against the mother only, noting that father was not named in the petition and was not an offending parent. Maya was ordered detained from her mother and placed with father, who did not oppose the petition. The matter was set for a contested jurisdictional and dispositional hearing.

### B. Jurisdiction and Disposition

#### 1. DCFS's jurisdiction/disposition report

On January 14, 2013, DCFS provided a "Jurisdiction/Disposition Report" indicating that mother had pleaded no contest to a misdemeanor charge of "obstruction of justice" arising out of the Thanksgiving night incident. The report also included summaries of additional interviews DCFS had conducted with the family members. During an interview on January 7, 2013, Maya told DCFS that mother and aunt "were arguing about their drinks and my mom was biting her on the arm." She also reported that mother drank alcohol at home, but father did not. Maya told the social worker she wanted to continue living with her "father and stepmother."

During an interview on January 3, 2013, father told DCFS he had dated mother for two months while living in Los Angeles and then moved back to New York to finish college. While living in New York, mother called and informed him she was pregnant. Mother initially moved to New York to be with father, but "'it didn't work out so she moved back.'" Father reported the relationship had failed in part because mother had a "'bad drinking problem'" and would "'hit [him] around and pass out places.'" Father later moved to California to be closer to Maya, but mother would not allow him to see the child. Mother and father eventually went to family court and obtained a joint custody order. The family court order prohibited either parent from consuming alcohol while caring for Maya. Father also informed DCFS mother had ongoing issues with alcohol, explaining that "every year something like this has happened." He also reported that over the past several years, mother had sent him and his family numerous racist, homophobic text messages. Father opposed grandmother serving as Maya's visitation monitor because he believed the grandmother had enabled mother's drinking.

5

DCFS interviewed mother in the presence of the grandmother. Mother reported she had been diagnosed with severe depression and was taking medication. Although mother admitted she sometimes took her medication while drinking alcohol, she denied having a history of alcohol abuse, explaining "[it is] more of a history of high stress and situations stemming mostly from my daughter's father." Mother also admitted she had consumed alcohol on the night of her arrest but did not believe she was intoxicated. Mother asserted that, on Thanksgiving night, the aunt had become upset because her "'sexual preference was outed'" during a dinner party. Mother denied that any altercation occurred between her and the aunt and denied having struck aunt while she was driving. Mother claimed she had repeatedly asked to be let out of the car and felt that she was being kidnapped. Mother also stated she intended to "file charges" against the aunt "after all of this." The grandmother became upset during the interview, and blamed the incident on the aunt.

DCFS also re-interviewed the aunt, who confirmed the accuracy of her prior statements to the police. The aunt expressed concern that mother's mental state was deteriorating and believed mother was in need of more intense psychiatric counseling.

In its assessment and evaluation, DCFS concluded mother had "unresolved alcohol issues" and "unresolved mental health issues." DCFS also reported that mother had difficulty co-parenting with father, which was exacerbated by the grandmother. DCFS believed that Maya would be at substantial risk of harm if returned to mother based on numerous factors, including mother's ongoing alcohol abuse, her denial of having any problem with alcohol, her failure to accept responsibility for her actions and her inability to understand how her actions had caused her child to be detained from her.

DCFS noted that Maya was doing well in the care of her father, who provided a safe and stable home environment. DCFS recommended the court order Maya to remain in the care of father and his wife with family maintenance services. It further recommended that the court provide mother monitored visitation and reunification services, including drug testing and treatment, a parenting course and individual therapy.

6

## 2. *Addendum to the jurisdiction and disposition report*

In an addendum report dated April 12, 2013, DCFS reported that father had expressed ongoing concerns with grandmother's role as monitor for Maya. Father informed DCFS that during a recent visit, Maya had returned from mother's house crying because mother and grandmother yelled at her for not inviting them to her birthday party. Father also provided DCFS a copy of an email mother had sent to the parents of a child in Maya's class that accused him of being "sadistic" and "ly[ing] about everything." Mother encouraged these parents to write letters describing her relationship with Maya, which she intended to present to the court. Father provided DCFS with numerous other emails in which mother and grandmother accused him of lying and failing to provide Maya with proper hygiene and nourishment.

DCFS reported that although father was "taking wonderful care of Maya," the child appeared too stressed "from visits" with mother and was "feeling torn and . . . in the middle." DCFS concluded that mother's complaints regarding Maya's hygiene and nutrition were unfounded and had no concerns with leaving the child in father's care. DCFS believed mother was "highly focused on past issues in her relationship with [father] and their prior family law case." According to DCFS, mother's recent emails demonstrated she was attempting to "discredit[] father." Although mother was participating in drug and alcohol treatment and had passed all of her drug tests, she had failed to initiate individual counseling.

In its addendum report, DCFS recommended closing the matter pursuant to section 361.2 with a family law order awarding custody of Maya to father.

## 3. *Hearing on jurisdiction and disposition*

At the jurisdiction hearing, counsel for mother requested that the court dismiss the petition. Father's counsel agreed with DCFS's recommendation that the court sustain the petition and then terminate jurisdiction with a family law order awarding father sole physical and joint legal custody of Maya. Maya's counsel asked the court to retain jurisdiction to permit mother a chance to reunify. Counsel explained that the child had

7

indicated she wanted to be with both parents and demonstrated a strong attachment to mother. According to counsel, the case should therefore remain open in an effort to "close with joint custody to both of them."

The court sustained a single amended allegation under section 300, subdivision (b) asserting that mother has "an unresolved history of alcohol abuse which renders the mother at times incapable of providing regular care to the child . . ." The court dismissed the other allegations in the petition, explaining that it believed the incident on November 22, 2012 was "[an] isolated event" that did not "in and of itself, place Maya at substantial risk" of future physical or mental harm. The court also concluded that, to the extent mother had any mental issues, she was receiving treatment and taking her medication.

On disposition, the court rejected DCFS's recommendation to terminate jurisdiction and enter a family law order. The court explained that although section 361.2 provided it "discretion to terminate with a juvenile law custody order, [the statute] also [gave] the court discretion . . . when the noncustodial parent has taken custody in the interim to provide services." The court further explained that, pursuant to this authority, it was issuing a "home of parent father order" and ordering "reunification services to the mother." The reunification services were to consist of random drug and alcohol testing, a drug and alcohol assessment, individual counseling for "anger management," continued mental health treatment and parenting classes. The court also ordered father to participate in family maintenance services, which consisted of a co-parenting class. The court scheduled a six-month review hearing under section 364, which was to be held in October of 2013.

### C. *Mother's Section 388 Petitions*

#### 1. *Mother's first section 388 petition*

Three months after the court issued its jurisdiction and disposition orders, mother filed a section 388 petition requesting custody of Maya or, alternatively, to have her visits liberalized to unmonitored overnight visits. The petition asserted that since the court had

entered its orders, mother had passed 12 drug tests, completed a parenting course and had been seeing a therapist who reported that she was making progress. Mother was also attending AA meetings and had agreed to participate in a "Sentinel [ankle bracelet alcohol] monitoring program." Mother asserted the change in the court's order was necessary because "Maya was functioning better in pre-school when she lived with her mother, as reported by the pre-school director Lisa Wilson . . . Maya has continually asked her mother when will she be home."

On August 2, 2013, the court summarily denied the petition.

### 2. *Mother's second section 388 petition*

Less than four weeks after the court denied her first section 388 petition, mother filed a second section 388 petition requesting the court provide her custody of Maya or liberalize her visits, again citing her successful participation in reunification services. The second petition alleged "it would be in the best interest of Maya to return to her mother as Maya is continuously asking to be able to return home and she was well adjusted when she lived with her mother, as reported by the pre-school director."

In support of the petition, mother provided a letter from her therapist reporting that mother was "learning and practicing ways to manage stressors and anger" and had experienced no "outbursts since our work together." The therapist further noted that he expected a "pattern of healthy parenting to continue after [mother and Maya's] reunification." Mother also presented a letter from her mental health counselor explaining that mother was continuing treatment for depression and appeared to be a bonded, capable parent. Mother provided an additional letter from the director of Maya's children's program stating that the director had never witnessed mother exhibit any "anger issues" and that the child had always appeared well-adjusted while in mother's care. The court set a hearing on the petition on the same date as the six-month review hearing.

On October 10, 2013, DCFS filed a status review report responding to the second section 388 petition. DCFS reported that, during the past period of supervision, the

9

agency had been forced to replace grandmother as Maya's visitation monitor. According to DCFS, the change was necessary because the grandmother had become combative with father during several drop-offs. The report also indicated that mother had complained to "each [social worker] assigned to the case that the child has witnessed the father and his wife engage in marital sexual relations." After investigating these allegations, the agency concluded they were unfounded.

DCFS reported that Maya was doing well in the care of father and had recently completed her individual counseling. A letter from her therapist stated that Maya had originally been diagnosed with "Adjustment Disorder" and exhibited symptoms of anxiety, sleep difficulties, crying episodes and fear of the dark. The therapist also stated that these symptoms had been largely resolved during treatment she received between March and September of 2013.

DCFS also reported that while mother had completed a co-parenting class and other forms of reunification services, she continued to exhibit problematic behavior. In September mother had requested a meeting with DCFS to discuss liberalizing her visits. During the meeting, mother continued to blame the maternal aunt for the events that led to mother's arrest, denied having any issues with alcohol and claimed that she had only one glass of wine on the night of her arrest. According to DCFS, mother "wished to make the entire meeting about father and his inability to care for Maya and how he is [an] unfit parent." Although DCFS attempted "to . . . redirect her to discuss her [own] progress," she remained focused on father. Mother also denied that she had any issues or behaviors that needed to be addressed, explaining that her only issue was "having a sister who created the problem." Mother also asserted the "the Dependency Investigator['s] . . . report is all lies" and that DCFS had continually "disregarded the fact that Maya was terrified to live with [father]" and "wanted to live with her." DCFS subsequently interviewed Maya, who stated that she had no fear of her father.

DCFS also reported that, at the end of a recent visit with mother, Maya told the monitor she had "changed her mind about living partly with mother and father and wanted to live mostly with mother and 'spend some nights with father.'" After removing

Maya from mother, the monitor asked the child why her feelings had changed. Maya initially said "because," but later acknowledged her mother had directed "her to say something." During an October visit, the monitor witnessed mother call the grandmother on the phone and then heard the grandmother talk to Maya about "coming home and living with them." At that point, the monitor reminded mother and grandmother they should not be discussing the case with Maya.

Mother's counselor provided a positive report, explaining that he believed mother was making progress and that he had never seen her experience any type of anger-related outburst. When DCFS informed the therapist of the recent problems it had with mother, the therapist stated he was surprised because mother had never exhibited such behaviors in his presence. DCFS believed mother was "reporting one side to [the therapist] and another to [DCFS]." Based on its own interactions with mother, the agency concluded that she still refused "to take any responsibility," continued to "blame[] . . . DCFS for the current situation" and had not yet developed an ability to co-parent. DCFS recommended that the court deny the section 388 petition and that the case be "continued for six months for a 364."

At a hearing on October 11, 2013, the court denied the section 388 petition without taking evidence. The court concluded that mother had failed to demonstrate Maya's best interests would be promoted by awarding custody to mother or liberalizing mother's visits. The court continued the six-month review hearing until January 3, 2013.[2]

---

**2** Mother appealed the denial of her second section 388 petition. Mother's appointed counsel provided a *Phoenix* letter advising the court there were no arguable issues. (See *In re Phoenix H*. (2009) 47 Cal.4th 835, 845.) Mother filed a supplemental brief in the form of a letter. On April 2, 2014, we issued an order of dismissal concluding that the letter brief failed to "identify any legally cognizable error in the juvenile court's order." (See *In re Maya L.* (April 2, 2014) Case No. B252340.)

11

### 3. *Mother's third section 388 petition*

Shortly after her second section 388 petition was denied, mother filed a peremptory challenge pursuant to Code of Civil Procedure section 170.6 seeking the removal of the presiding juvenile court judge and reassignment to a new department. The challenge was granted and the matter was transferred to a new division.

Five weeks later, mother filed a third section 388 petition stating in part: "I have been in full compliance for 6 months. DCFS [social workers] . . . refuse to liberalize. I am treated punitively for trying to see my daughter. . . . Fraudulent reports were submitted to the court and I have evidence to the contrary. DCFS worker [A.L] yelled at, intimidated, grabbed at my daughter during prayer. Refuses to report abuses. Moves my visits illegally and without cause." Mother's petition requested that the court "hold [the DCFS social worker] in contempt," "return child to home of mother" and "terminate DCFS involvement," which mother alleged was "groundless and harmful to [Maya]."

The petition alleged these changes were necessary because (1) DCFS had "given [the child] a psychological disorder"; (2) Maya was "better cared for physically, emotionally and psychologically [by mother]"; (3) Maya "continually asks to come home"; and (4) "father tells her I do not want her, which is why he has her." The court set the petition for a hearing on February 11, 2014 and continued the six-month review hearing to the same date.

## D. Six-Month Review Hearing and Termination of Jurisdiction

### 1. *DCFS progress report and response to third section 388 petition*

On February 7, 2014, DCFS provided a progress report that included a response to the third section 388 petition. DCFS reported that, during the period of supervision, mother had engaged in behavior that raised concerns regarding "her ability to manage her anger as well as her impulse control."

The report described several events that had occurred during recent monitored visits with Maya. On November 21, 2013, grandmother and mother visited with Maya at a local mall. The grandmother asked the social worker why the visits needed to be

12

monitored. After telling the social worker she had no soul, the grandmother began chanting "child abuser" at the social worker, causing people at the mall to stare. Mother also began acting aggressively toward the social worker, repeatedly yelling "Why do I need a monitor?" The social worker informed the mother and grandmother that they needed to stop engaging in such behavior in front of Maya. Mother, however, got "right [in the social worker's] face" and repeatedly stated "answer my question." Mother then blocked the social worker's access to Maya, who was being held by grandmother. The social worker instructed Maya the visit was over and the child tried to pull away from grandmother. Mother, however, grabbed Maya and stated "we are going to pray." Mother then forced Maya to hold hands in a circle with grandmother and began praying. Mother instructed Maya not to be intimidated or scared by the social worker. DCFS's report described mother's behavior during the incident as "volatile," "erratic" and "impulsive."

Following this incident, DCFS required that all future visits occur at the DCFS regional office. When informed of this change, mother told DCFS she would no longer permit the agency to "interact[] with [Maya]" and accused the social worker of being an "abuser" who needed to be "removed." Over the next three weeks, mother failed to attend her scheduled monitored visits. Mother resumed her visits on January 16 and 24, 2014. During those visits, she spent about "30 to 40 minutes . . . just staring at the [social worker] over the back of Maya's head." According to the report, mother stared "continuously . . . . as if trying to intimidate [the social worker]."

The report also indicated mother continued to make complaints against father. During a monitored visit, Maya had told mother her neck was sore because father had pulled her out of the way of an oncoming horse. Mother immediately informed DCFS it needed to investigate whether father had choked Maya. During several subsequent visits, mother inquired why father had not been reported for choking Maya. DCFS, however, had spoken to father and Maya about the incident and concluded he had not choked the child. Father explained that, during a recent visit to San Diego, he had pulled Maya out of the way of an oncoming horse carriage. Maya had no marks on her neck and denied

13

that father had choked her. Maya confirmed that father had pulled her out of the way of an oncoming horse carriage and denied ever telling mother that father had choked her. Although DCFS's investigation concluded father had engaged in no wrongdoing, a child abuse hotline received a reference alleging father had choked Maya because "father was upset Maya had touched a horse." The police investigated the allegations and concluded they were unfounded. When DCFS attempted to speak with mother about the allegation, she refused to cooperate and became "very disrespectful."

Mother also continued to report concerns about Maya's hygiene, alleging that father had given the child head lice and did not bath her or comb her hair. DCFS investigated these allegations and found the child to be in good condition. Maya reported that she was bathed and had her hair brushed every night before bed. Although the director of Maya's school confirmed Maya was one of several students who had developed lice, the director stated that there was no evidence suggesting the lice had originated with Maya.

DCFS also reported that, as a result of the mother's recent behavior, father had reinitiated Maya's individual therapy. Maya's therapist informed DCFS that, since December, the child had attended five sessions and appeared to be "very much caught in between her parents." The therapist further stated that Maya was "very confused" and had started using the term "I don't know" as a "way of not talking about a something so she does not feel like she will get someone in trouble." DCFS expressed similar concerns about Maya's mental state, explaining that she had begun expressing feelings of "confusion" as the result of mother's behavior and felt like "she did something wrong" whenever mother said Maya should be living with her.

In its assessment and evaluation, DCFS concluded that "Maya has grown immensely under the care of her father and his wife" and exhibited "comfort and attachment" toward both of them. DCFS had "no concerns in Maya being under the care of her father." It did, however, have "concern" regarding mother's behavior and believed it would not "be in the best interests of the child that she be returned to her mother or that visits be liberalized." According to DCFS, despite eight months of therapy, mother still

refused to "acknowledge her problems and does not accept any responsibility on her part." Mother also continued to blame those around her for the current situation and demonstrated an inability to co-parent, as evidenced by the fact that she still "put[] Maya in the middle." DCFS recommended the court deny the third section 388 petition and terminate jurisdiction over Maya, with a family law order granting sole physical and legal custody to father.

### 2. Six-month review hearing

On February 11, 2014, the court held a hearing on mother's section 388 petition and the section 364 review. The court initially denied the section 388 petition, explaining that the DCFS reports demonstrated mother's behavior had not changed and that she continued to display aggressive conduct that had a negative impact on the child.

The court then invited the parties to present their evidence on the contested section 364 review hearing. Before calling any witnesses, mother's counsel asserted the hearing should be held under the standards set forth in section 366.21, subdivision (e), which required the court to return Maya to mother's care unless DCFS showed by a preponderance of the evidence that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." Counsel argued that because the trial court had previously placed the child with father and ordered both parents to participate in services pursuant to section 361.2, subdivision (b)(3), the court was required to proceed with a six-month hearing under section 366.21, not section 364. The juvenile court, however, explained that section 364 applied because Maya had been placed with one of her parents. The court then directed the parties to continue with their evidence.

Mother called Maya and herself as witnesses. Maya, who testified in chambers, stated that she enjoyed living with father and her mother. She expressed a desire to live with mother on the weekends and father during the week. She also stated that she loved mother and had no fear of her. When asked to discuss several of the incidents described in the DCFS reports, Maya repeatedly stated that she could not remember.

15

Mother testified that she took "full responsibility for being here" and asserted that she had developed the ability to "co-exist" with father. Mother also testified that she had not had a drink of alcohol since Thanksgiving of 2012 and that, through her counseling and parenting classes, she had learned strategies to manage her anger. Mother asserted she had begun focusing on "keeping her side of the street clean," meaning that she focused on her own conduct and behavior, rather than the conduct of those around her.

Mother repeatedly denied, however, several of the incidents described in the DCFS reports. First, mother denied that she had acted aggressively toward DCFS during the November incident at the mall. According to mother, the social worker had attempted to break up the family's prayer circle. In response, mother had asked "can we please continue to pray," at which point the "circle was aggressively shaken apart by the case worker, and that pretty much ended the visit right there." Mother denied she had done anything to cause the social worker to try to remove Maya from the prayer circle and denied that grandmother ever called the social worker a "child abuser." Mother asserted there had been no conflict until the social worker interfered with the prayer circle.

Mother also denied staring at the social worker during her recent January visits. Mother testified that, contrary to DCFS's claims, the social worker had actually been staring at mother and Maya, which caused Maya discomfort. Mother also denied making any reports or complaints about father's alleged failure to keep Maya clean, about choking the child or engaging in sexual conduct in the child's presence.

Mother also affirmed her belief that DCFS had caused Maya to have "psychological disorders" and was violating the child's rights by refusing to allow her to return to mother's custody. Mother claimed her frustration with DCFS had caused her to develop "skin lupus" and "lose 20 pounds."

At closing argument, mother's counsel argued there was no risk of returning Maya to mother's care, nor was there any evidence mother had "put Maya in the middle or is somehow trying to make her choose." Counsel also argued mother and grandmother's interactions with DCFS were not relevant to any placement decision regarding Maya. Counsel contended the evidence suggested Maya's emotional distress was caused by

16

"being away from her mother" and requested the court terminate jurisdiction and award mother joint custody, or alternatively, liberalize her visits to non- monitored.

Counsel for DCFS, father and Maya, however, each argued that mother's testimony was not believable and that the case should be terminated with a family law order providing father sole custody of Maya and monitored visits for mother. Each counsel asserted mother still appeared to blame others for what had occurred, lacked insight and demonstrated a continuing inability to co-parent.

The court agreed, explaining that it did not find mother credible. The court also noted that a significant amount of the conduct described in the DCFS reports had occurred after mother completed her co-parenting course, suggesting that she still presented a risk to Maya. The court then terminated its jurisdiction and entered a family law order providing father custody of Maya with monitored visits for mother.

## DISCUSSION

A. *DCFS was not required to establish that returning Maya to her mother's care would create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the child*

Mother initially contends that the juvenile court applied the wrong standard at the six-month review hearing. The juvenile court explained that because Maya had been placed with her father, it was applying the standards set forth in section 364. Mother, however, argues that section 361.2, subdivision (b)(3) expressly requires the juvenile court to proceed under section 366.21, subdivision (e) when, as here, the child has been placed with a noncustodial parent pursuant to section 361.2 and both parents were ordered to participate in services. Mother further argues that, under 366.21, subdivision (e), the court was required to return Maya to mother's custody unless DCFS proved that doing so would create a substantial risk of harm to the child's physical or emotional well being.

17

### 1. *Summary of applicable statutes*

#### a. *Statutes governing placement of the child at disposition*

Once the juvenile court has assumed jurisdiction, the court must hold a disposition hearing to determine, among other things, an appropriate placement for the child. The court generally has three choices. First, if the court determines the child would not be at substantial risk of physical or emotional harm if left in the custody of the offending parent or parents, the court may leave the child in parental custody and "order family maintenance services to ameliorate the conditions that made the child subject to the court's jurisdiction." (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 302 (*Bridget A.*); § 362, subd. (b).)

Second, if the court determines the child would be at substantial risk of physical or emotional harm if left in parental custody, section 361.2 requires the court to "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) If such a parent exists—referred to as the "noncustodial" parent[3]—the court is then required to place the child with that parent unless if finds that doing so would be detrimental to the physical or emotional well-being of the child.

If the court places the child with a noncustodial parent under section 361.2, subdivision (a), it has the option to either terminate jurisdiction with a custody order in favor of the noncustodial parent or retain jurisdiction and order services to either or both parents. The first option is set forth in section 361.2, subdivision (b)(1), which states: "[If the court places the child with a noncustodial parent, it may] [o]rder that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the . . . parent [from whom the child was removed]. The court shall then

---

[3]      "The Legislature and the courts have used the phrase 'noncustodial parent' to refer to a parent described by section 361.2, subdivision (a)." (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 55, fn 6.) The parent who had physical custody of the child at the time of the events that gave rise to the petition "is often referred to as the 'custodial parent.'" (*Id.* at p. 55, fn. 5.)

18

terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."

The second option is set forth in subdivision (b)(3), which states: "[If the court places the child with a noncustodial parent, it may] [o]rder that the parent assume custody subject to the supervision of the juvenile court. In that case the court may order that reunification services be provided to the parent . . . from whom the child is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to Section 366, which parent, if either, shall have custody of the child."[4]

Finally, if the court determines removal from parental custody is necessary and there is no noncustodial parent willing to assume custody, the court must order the child under the supervision of the social worker, who is then responsible for selecting an appropriate out-of-home placement. (See § 361.2, subd. (e).)

### b. Six-month review hearing

"If a child has been declared a dependent of the juvenile court and placed under court supervision, the status of the child must be reviewed every six months." (*Bridget A., supra,* 148 Cal.App.4th at p. 303.) The applicable standards at the six-month review hearing differ depending on the child's placement.

Section 364 governs when "a child under the supervision of the juvenile court . . . is not removed from the physical custody of his or her parent or guardian." (§ 364, subd. (a).) At a section 364 six-month review hearing, the court is required to "determine

---

[4]    Section 361.2, subdivision (b)(2) provides the court a third option that is not relevant here. Under this third option, the court may "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months. . . . After the social worker conducts the home visit . . . the court may then take the action described in paragraph (1), (3), or this paragraph."

whether continued supervision is necessary." (§ 364, subd. (c).) Termination of jurisdiction is required "unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

Section 366.21, subdivision (e) governs when a child has been removed from the custody of a parent. If the child has been placed in out-of-home care, section 366.21, subdivision (e) requires the court to return the child to parental custody at the six-month hearing unless the social worker establishes "by a preponderance of the evidence[] that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

The statute, however, includes a separate paragraph describing the procedures used at a six-month review hearing for a child who was removed from a custodial parent and placed with a noncustodial parent pursuant to section 361.2: "If the child had been placed under court supervision with a previously noncustodial parent pursuant to Section 361.2, the court shall determine whether supervision is still necessary. The court may terminate supervision and transfer permanent custody to that parent, as provided for by paragraph (1) of subdivision (b) of section 361.2." (§ 366.21. subd. (e).)

Thus, under section 366.21, subdivision (e), the standards applicable to a six-month review hearing for a child placed with a noncustodial parent are similar to the standards applicable to a section 364 six-month review hearing for a child who was not removed from a custodial parent. In both instances, the court must "determine whether continued supervision is necessary." However, for a child placed with a noncustodial parent under section 361.2, subdivision (a), the court need not consider whether "the conditions still exist which would justify initial assumption of jurisdiction under Section 300." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451 (*Janee W.*) ["When deciding whether to terminate jurisdiction [over a child placed with a noncustodial parent], the court must determine whether there is a need for continued supervision, not whether the conditions that justified taking jurisdiction in the first place still exist, as required under

20

section 364"]; see also *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1497 (*Sarah M.*) [disapproved on other grounds, *In re Chantal* (1996) 13 Cal.4th 196, 204] [when deciding whether to terminate jurisdiction over a child placed with noncustodial parent, juvenile court is not required to inquire whether conditions that originally supported jurisdiction still exist].)

> 2. *The juvenile court was only required to determine whether its supervision was still necessary, not whether returning Maya to mother's care would place the child at substantial risk of harm*

The parties do not dispute that, during the disposition hearing, the juvenile court: (1) ordered Maya removed from mother's physical custody and placed the child with father, who qualified as a noncustodial parent under section 361.2, subdivision (a); (2) rather than terminating jurisdiction and awarding father custody pursuant to section 361.2 (b)(1), the court elected to retain jurisdiction and ordered both parents to participate in services pursuant to section 361.2, subdivision (b)(3). The parties disagree, however, which statute and standard governed Maya's six-month review hearing in light of the court's disposition order.

DCFS contends that because Maya was placed with a parent (father), the juvenile court properly concluded that the six-month hearing was governed by the standards set forth in section 364. Mother, however, asserts that under 361.2 subdivision (b)(3), the six-month hearing was governed by section 366.21, subdivision (e). Mother further argues that, under section 366.21, the court was required to return Maya to her physical custody unless DCFS established that doing so would create a substantial risk of detriment to the safety, protection or physical or emotional well-being of the child.

Under the statutory framework summarized above, however, neither party is entirely correct. First, contrary to DCFS's position, numerous cases have concluded that because section 364 applies only when a child has "not [been] removed from the physical custody of his or her parent" (§ 364. subd. (a)), the statute is inapplicable when, as here, a child has been removed from one parent and placed with the other under section 361.2, subdivision (a). (See *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 264 (*Nicholas H.*);

21

*Janee W.*, *supra*, 140 Cal.App.4th at p. 1444; *Sarah M., supra,* 233 Cal.App.3d at pp. 1493-1494 [section 364 should only be applied "when the dependent child has not been removed from the original custodial home"].)

Moreover, as mother correctly argues, section 361.2, subdivision (b)(3) specifically directs that when a child is placed with a noncustodial parent and both parents are ordered to participate in services, review hearings must be "held pursuant to section 366." This language makes clear that "when a dependent child is placed with a previously noncustodial parent and both parents are afforded services, review hearings are to be held pursuant to . . . section 366 *et seq.* [Citation.]" (*Nicholas H., supra,* 112 Cal.App.4th at p. 264.) Thus, the text of sections 364 and 361.2, subdivision (b)(3) and the cases interpreting those statutes support mother's view that Maya's six-month review hearing was governed by the standards and procedures set forth in section 366.21, subdivision (e), rather than those in section 364.

Mother is incorrect, however, that section 366.21, subdivision (e) required the juvenile court to return Maya to her custody unless DCFS established that doing so would create a substantial risk of harm to the child's physical or emotional well-being. This argument ignores the directive in section 366.21, subdivision (e) that "[i]f the child had been placed under court supervision with a previously noncustodial parent pursuant to Section 361.2, the court shall determine whether supervision is still necessary." Subdivision (e) further directs that if the court concludes supervision is no longer necessary, it may "transfer permanent custody to that parent, as provided for by paragraph (1) of subdivision (b) of section 361.2." Under section 361.2, subdivision (b)(1), the court is authorized to enter what is commonly referred to as a "family law" or "exit" order transferring custody of the child to the parent with whom the child was placed and, if appropriate, grant visitation to the parent from whom the child was detained. (See *In re Ryan K.* (2012) 207 Cal.App.4th 591, 594, fn. 5 & 596 [explaining that custody and visitation orders issued upon termination of jurisdiction are frequently referred to informally as "'family law'" orders or "'exit' orders].)

In sum, although mother is correct that the six-month hearing was governed by section 366.21, subdivision (e) rather than section 364, that statute did not require the court to return Maya to her custody in the absence of evidence establishing that doing so would create a substantial risk of harm to the child's physical or emotional well-being. Rather, because Maya had previously been placed with her father under section 361.2, subdivision (a), the court was only required to determine whether its supervision over Maya was still necessary and whether to enter an exit order.

We further conclude that although the juvenile court erroneously referenced section 364 when making its ruling at the six-month review hearing, the court's orders make clear that it did in fact follow the standards and procedures set forth in sections 366.21, subdivision (e) and 361.2, subdivision (b)(1). After hearing the parties' evidence, the court found that juvenile court supervision of Maya was no longer necessary and then entered a family law order providing father full physical and legal custody of Maya. Because the court's orders demonstrate it applied the standards set forth in section 366.21, subdivision (e) and 361.2, subdivision (b)(1), any error it may have committed by referencing section 364 was necessarily harmless. (See *Janee W.*, *supra*, 140 Cal.App.4th at p. 1452-1453 [juvenile court error in applying section 364 rather than section 361.2 was harmless given the similarity of the standards set forth in the two statutes]; *Sarah M.*, *supra*, 233 Cal.App.3d at pp. 1494-1495 [although court improperly relied on section 364 when terminating jurisdiction, the error was harmless because there was sufficient evidence to terminate jurisdiction under section 361.2].)

### B. The Trial Court Did Not Abuse its Discretion in Awarding Custody to Father

In the remainder of her brief, mother argues that we must reverse the juvenile court's custody order because DCFS failed to provide "substantial evidence [that] returning Maya to her mother's care, by way of a joint legal and physical custody arrangement, would create a substantial risk of detriment to her safety, protection or physical or emotional well-being." Mother argues that none of the conduct set forth in DCFS's reports, including her failure to accept responsibility for her child's detention,

her ongoing disputes with DCFS and grandmother's erratic behavior, supports a finding of substantial risk to Maya. For the reasons set forth above, however, we reject mother's assertion that the "substantial risk" standard applies under the circumstances of this case. Rather, the court was only required to determine whether juvenile court supervision of Maya was still necessary and, if not, who should receive custody of Maya.

Although mother has presented her argument under the wrong legal standard, it is nonetheless apparent that she is challenging the trial court's decision to award father sole legal and physical custody of the child.[5]

### 1. Standard of review

We review a juvenile court's custody orders for abuse of discretion. (See *Bridget A.*, *supra*, 148 Cal.App.4th at p. 300; *Nicholas H., supra*, 112 Cal.App.4th at p. 265, fn.4 [court has "broad discretion to make custody orders when it terminates jurisdiction in a dependency case"]; cf. *In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319 [change of placement determinations are generally reviewed under an "abuse of discretion" review].) "When applying the deferential abuse of discretion standard, 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations.]" (*In re C.B.* (2010) 190 Cal.App.4th 102, 123.)

### 2. The juvenile court's order awarding custody of Maya to father was not an abuse of discretion

"When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child. [Citations.] Furthermore, the court is not restrained by 'any preferences or presumptions.' [Citation.] Thus, for example, a finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not

---

**5** Mother does not appear to challenge the court's decision to terminate jurisdiction over Maya. Mother has never asserted that the court erred in finding that father was capable of caring for Maya without court supervision.

be in the child's best interests for a variety of reasons. [Citation.]" (*Nicholas H.*, *supra*, 112 Cal.App.4th at p. 268.)

Based on the evidence in the record and the juvenile court's factual findings at the six-month review hearing, the court did not abuse its discretion when it awarded father custody of Maya. The record contains overwhelming evidence that father provided excellent care for Maya and that father and daughter shared a strong, loving bond. DCFS consistently reported it had no concerns regarding father's ability to care for the child and repeatedly recommended the court provide him with custody. Maya's counsel made the same recommendation.

In contrast, the DCFS reports and visit logs demonstrate that even after completing a parenting course and participating in months of anger management therapy, mother continued to display erratic, aggressive behavior toward DCFS while in the presence of the child. During the three month period preceding the review hearing, mother repeatedly confronted DCFS about the need for monitored visits and attempted to intimidate multiple social workers. On one occasion, mother blocked the monitor from accessing the child, while repeatedly asking why she was not permitted to have unmonitored visits. Although the monitor directed mother to stop asking those questions in front of the child, mother refused. During two other visits, mother continually stared at the DCFS monitor while Maya sat in her lap. Mother also repeatedly told Maya she should be living with mother and, at one point, instructed the child to tell DCFS she wanted to live with mother. DCFS reported that this conduct had caused Maya to feel like she was doing something wrong. Shortly before the review hearing, Maya's therapist similarly reported that the child was feeling confused about the parents' dispute and feeling "caught in between her parents."

The record also contains evidence that mother continually exposed Maya to the grandmother, who engaged in erratic behavior throughout the dependency proceeding. In October of 2013, DCFS removed grandmother as Maya's visitation monitor based on combative behavior she had exhibited toward father in the child's presence. Several months later, grandmother attended a monitored visit with Maya and proceeded to chant

"child abuser" toward the DCFS monitor. On another occasion, the monitor reported that mother had called grandmother so she could speak to Maya. Although the grandmother and mother had been told not to speak with Maya about the dependency matter, the monitor heard grandmother talking to Maya about "coming home and living with them."

The record also contains evidence that mother continues to minimize her role in these events and deflect blame toward her sister, DCFS and father. In a report filed in October of 2013, DCFS indicated that mother refused to discuss any issues related to her own behavior and was focused entirely on father's alleged inability to care for Maya. In a section 388 petition filed in December, mother alleged DCFS was falsifying its reports and had caused Maya to suffer "psychological disorders." She made similar statements at the six-month review hearing. After listening to mother's testimony, the court concluded that she was not credible and continued to "deflect . . . responsibility."[6]

Given the extensive evidence of mother's recent erratic conduct during monitored visits and her ongoing refusal to accept responsibility for any wrongdoing, the court was entirely justified in concluding that mother has not yet developed the ability to co-parent effectively and that a joint custody order would not currently be in Maya's best interests .

---

[6]     Throughout these proceedings, mother's primary response to the evidence set forth in the DCFS reports is that the social workers have consistently misrepresented the facts of the case. At the review hearing, however, the juvenile court chose to believe the information in the DCFS reports, concluding mother was not credible. As a reviewing court, we have no power to revisit the credibility of witness or reweigh the evidence. (See generally *In re Casey D*. (1999) 70 Cal.App.4th 38, 52-53 ["'It is the [juvenile] court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.]'"].)

## DISPOSITION

The juvenile court's order terminating jurisdiction and accompanying custody order are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

27

Filed 12/8/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re MAYA L., A Person Coming Under the Juvenile Court Law. | B254628 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK96699) |
| Plaintiff and Respondent, | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| v. | |
| ASHLEY L., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed November 17, 2014 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondent's request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.,                          WOODS, J.,                          ZELON, J.