Filed 3/5/26  In re M.H. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.H., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW H.,<br><br>    Defendant and Appellant. | A173830<br><br>(Alameda County<br>Super. Ct. No. JD036108-01) |

Appellant Matthew H. (father) appeals from a juvenile court exit order (Welf. & Inst. Code,[1] § 364) requiring he share joint physical and legal custody of his minor son, M.H., with the child's mother, R.B. (mother).[2] Father contends the juvenile court abused its discretion in determining that joint physical and legal custody was in the child's best interests.  We affirm.

---

[1]Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2] Mother has not appealed.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

*A. Initial Referrals*

The family came to the attention of Alameda County Social Services/Children and Family Services (agency) in October 2022, when then three year old M.H. was living with mother. At that time, there was a pending family court case regarding mother's alleged failure to comply with visitation orders. The agency had received multiple referrals that M.H. had been sexually abused by father. Between July 2022 and March 2023, mother repeatedly brought M.H. to the emergency room where he underwent invasive sexual assault exams;[3] each exam yielded no evidence of sexual abuse or trauma. Also during this timeframe, M.H. participated in three forensic interviews at the Child Abuse, Listening, and Coordination Center (CALICO), which similarly disclosed no evidence of sexual abuse. Despite the absence of any evidence of sexual abuse, mother continued to believe M.H. was being sexually abused by father.

Hospital staff became concerned that the continued sexual assault exams could further traumatize M.H., causing him emotional harm and stress. It was reported that mother discussed inappropriate adult content and graphically described sexual abuse in front of M.H. It was further reported that mother took pictures of M.H.'s genitals prior to his visits with father in an effort to prove her allegations of sexual abuse.

*B. Detention*

On April 4, 2023, the agency took M.H. into protective custody and placed him with father. The agency was concerned that M.H. was being subjected to unnecessary stress as a result of the repeated examinations and

---

[3]M.H. had been subjected to four sexual assault exams by March 2023.

CALICO interviews due to mother's accusations; the agency also had concerns that mother's mental health impaired her ability to make appropriate decisions for M.H.

On April 6, 2023, the juvenile court detained M.H. from mother and placed him with father. The juvenile court ordered mother to have at least two hours supervised visitation with M.H. per week and it gave the agency the discretion to authorize one supervised phone call per week. Mother's case plan called for her to stabilize her mental health and demonstrate an understanding of how her mental health could impact M.H. The agency worried mother was preoccupied with sexual abuse because mother had a long history of trauma beginning at a young age, and because one of her older children from a prior relationship had been sexually abused by a family member. Mother had been working with a therapist since that prior incident of sexual abuse.

Following M.H.'s detention, mother joined a support group and a parenting class. The agency believed mother was taking the steps necessary to rehabilitate her mental health and was trying to grow and think before she spoke. In addition to the agency's concerns about mother's mental health, it also worried that "the parents have struggled to co-parent and that [M.H.] has been placed in the middle of their conflict with each other."

*C. Jurisdiction and Disposition*

In September 2023, following a contested jurisdiction and disposition hearing, the juvenile court adjudged M.H. as a dependent and provided family maintenance services to father and family reunification services to M.H. and mother.

*D. Six-Month Review*

At the six-month hearing in March 2024, the juvenile court granted the agency discretion to authorize overnight visits between M.H. and mother; the court continued family reunification services for mother and M.H. During the review period, mother continued therapy, began taking a co-parenting class, and completed a psychological evaluation. The evaluation found that despite having impaired cognitive ability, mother's therapy would help her improve her coping skills and ability to manage relationships. The evaluation noted mother was a hardworking and caring parent. Mother's co-parenting class facilitator also reported mother was cooperative and wanted to co-parent for M.H.'s best interests. The same facilitator noted father was cooperative, but also angry and hurt; he wanted sole custody of M.H.

The agency reported concerns about mother's failure to discuss the sexual abuse allegations in therapy; nevertheless, the agency was pleased at mother's willingness to engage in services. Mother acknowledged that she believed M.H. was safe with his father now. Going forward, mother said she would call the Child Protection Hotline and local law enforcement before taking M.H. to be examined if she suspected abuse. The agency reported that M.H. was bonded with both parents. M.H. stated he felt happy when he was with either parent.

*E. Interim Review*

At an interim review hearing in July 2024, the court ordered mother to have overnight weekend visitation every other weekend with M.H. By that time, the agency had already increased mother's visitation with M.H. to three days per week, including one overnight. During the review period, neither parent reported any concerns regarding M.H.'s care. Nevertheless, the agency still had concerns that both parents' inability to co-parent placed M.H.

4

in the middle of their conflict with one another. Despite this conflict, M.H. was bonded with both parents. The agency recommended that M.H.'s primary residence be with father, with sole legal custody to father and shared physical custody between mother and father.

The social worker attached a service report from the parents' co-parenting class to the agency's July 2024 interim report. The service report found that both parents in the past had accused the other of domestic violence and that both parents' distrust and resentment of the other interfered with each parent's ability to work in the best interest of M.H. The report further found that "[b]oth parties misuse and weaponize child custody over the other parent as a means to validate their own parenting or determine who is the better parent." The service report concluded that "both of these parents indeed bring value and support to the minor, and no contact with either would be detrimental to [M.H.'s] growth, development, and mental and emotional wellbeing."

*F. Twelve-Month Review*

At the initial twelve-month review hearing on October 1, 2024, the agency recommended that the court terminate jurisdiction and that mother and father share legal custody, with father receiving sole physical custody. During the review period, a new social worker had been assigned to the case. During an initial conversation, mother told the new social worker she was not interested in additional therapy and that she was ready to move on from the case. After that initial conversation, mother apparently blocked the new social worker's phone number. Mother's therapist told the agency that mother had spoken openly and in detail about the sexual abuse claims and had been good at processing her feelings. According to the agency's report,

5

mother continued to believe that father had abused M.H. but did not believe he was still abusing him.

During the twelve-month review period, father's participation in the co-parenting class decreased. The agency was still concerned that both parents were putting M.H. in the middle of their conflict with one another. Mother told the social worker that she wanted to attend parenting classes with father, but in the past, that he had refused to attend parenting classes. Father reported that M.H. was often drowsy and sometimes vomited when he returned from a visit with mother and he suspected mother gave M.H. melatonin. Because he was concerned for M.H.'s health, father shared that he took M.H. to the emergency room, but the hospital would only conduct a urine test, not a blood test; the results of the test were not disclosed in the report.

Also during this review period, M.H.'s teacher reported she had troubling encounters with mother. On the first day of school, mother waited for the teacher at her car and introduced herself. Mother then helped the teacher with some of her bags. Following that encounter, mother arrived at school several times asking for M.H.'s homework and informing the teacher of her rights as a parent. Mother often repeated herself during these interactions. After several encounters, M.H.'s teacher became uncomfortable with mother. Thereafter, M.H.'s principal and mother agreed to interact directly. Following that agreement, mother no longer disturbed the teacher.

At the October 1, 2024 hearing, the court received the agency's reports in evidence and scheduled a contested hearing. In December 2024, the court increased mother's visitation with M.H. from three hours per visit to four.

*G. Contested Hearing*

In March 2025, the agency filed the co-parenting clinician's service report covering July 2024 to February 2025. The report noted that though both parties attended less frequently, father stopped attending the co-parenting sessions altogether since the twelve-month hearing, whereas mother attended much more consistently. Father later re-engaged with the classes in February 2025. The report found that both parents felt sabotaged by the other, were "highly charged" and "fixed in their positions," "misuse[d] and weaponize[d] child custody . . . as a means to validate their own parenting," and struggled with resentment which interfered with their ability to co-parent. The report stated, "[b]oth [parents] have the capacity and context to be vindictive, undermining, and reckless in their use of resources and providers to serve their own agenda and to slander the other parent to gain an unfair advantage and access." Nevertheless, the report concluded "there is no doubt these parents indeed bring value and love to their child; for the child to not have contact with either would be detrimental to his growth, development, and mental and emotional wellbeing . . . The question is not should the parties have parent-child access; they both absolutely should." (Underlining omitted.)

After numerous continuances, the court held a contested hearing on March 7, March 11, and April 3, 2025. On the first day of the hearing, the agency reported it had changed its custody recommendation to joint legal and physical custody, with M.H. spending equal time with both parents, but having primary residence with father. M.H.'s counsel and mother supported the agency's recommendation. Father contested the agency's new recommendation. According to counsel for M.H., he was more articulate than when the case began two years ago. He wanted to spend more time with his

7

mother than he was currently. M.H.'s counsel stated, "I think this really boils down to how [mother] and [father] are going to interact with each other when it comes to exchanges for [M.H.] and as [M.H.] gets older . . . how that looks like parenting going forward." The parties stipulated to a trial solely focused on custody orders.

M.H.'s social worker testified that in July 2024, the agency had recommended father have sole legal custody because, at that time, the agency felt father was better positioned to make legal decisions regarding M.H. based on the July 2024 co-parenting service report. Since then, the agency had changed its recommendation to joint legal custody to allow mother to take M.H. to a medical provider if he ever needed care. Though the agency recommended father have sole physical custody in October 2024, the social worker explained the agency now recommended joint physical custody because M.H. was spending 35 to 40 percent of his time with mother, and the agency believed that balancing both parents' time with M.H. would not be a material change. The social worker recommended M.H.'s primary residence remain with father to maintain consistency in his schooling and extra-curricular activities. On cross-examination, the social worker testified that though mother did not change her therapist as the agency requested, she still completed the activities the agency requested. She further explained that, in the future, mother had stated to the social worker that she would contact law enforcement if she suspected M.H. had been abused rather than taking M.H. "straight" to a medical examination.

M.H.'s kindergarten teacher testified that she was uncomfortable following several interactions with mother. As reflected in earlier agency reports, in August 2024, mother introduced herself to the teacher at the teacher's car on the first day of school, helped the teacher carry things to the

class, and then told the teacher father "had done a lot to her" but did not elaborate. Over the next five months, mother approached the teacher at the school several times. Ultimately, the teacher asked that the principal or an administrator be present when the teacher was speaking with mother. M.H.'s teacher also testified that M.H. was doing well academically and had a "very strong" report card. When M.H. had behavioral issues, the teacher spoke to whichever parent she saw first. She felt that both parents could help adjust M.H.'s behavior.

Father testified that on December 22, 2024, mother called him a "molester" and a "faggot" and said he was going to be beaten up; father said M.H. was present during this exchange. Father filed a police report about the incident. Father also testified that mother did not comply with family court visitation orders, saying: "That was all the time. Like, she never complied with no type of orders from when the family court gave me orders. I have a whole, big stack of papers of her not bringing [M.H.] and a lot of times that she wasn't bringing him."

Mother testified that she did not currently believe father had abused M.H. She also testified that apart from the first day of school, mother only spoke to M.H.'s teacher when she was picking up or dropping off M.H. Going forward, mother and teacher planned to continue to use an electronic communication application to discuss M.H.

Mother testified that she understood the harm in subjecting M.H. to multiple invasive examinations and in the future, she planned to rely on the professionals in his life and their best judgment if she feared M.H. was being harmed. Mother did not believe father was a danger to M.H. As long as M.H. was doing well in school, mother would not seek to change M.H.'s primary residence with father.

9

In its decision, the court found that mother had made progress dealing with school staff and coping with her suspicions of M.H.'s abuse. The court designated the father's home as the primary residence for M.H. and ordered joint legal and physical custody, with M.H. spending equal amounts of time with both parents. The court also offered family mediation to the parents to develop a schedule consistent with the court's order. During the court's comments, father asked to leave the courtroom. When the court told father to stay and listen, father expressed disbelief: "Five false allegations. Five false allegations, 50/50." The court responded, "You need to move beyond that. This is your son's life. That's his mother, always going to be."

*H. Mediation*

Following the contested hearing, parents attended mediation on April 24, 2025 and May 13, 2025. They reached an agreement whereby parents would share M.H. on a "2-2-5-5" schedule. Both parents would ensure his good attendance at school and extracurricular activities, parents would only communicate via the Talking Parents app, parents would inform each other of any medical care/injuries, and each would inform the other of any medical or dental appointments and work together to attend them.

On May 21, 2025, the court adopted the mediation agreement as part of its custody orders, signed those orders, and terminated dependency jurisdiction over M.H.

## II.

## DISCUSSION

*A. Applicable Law and Standard of Review*

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).) "The statute authorizes a juvenile court to make 'exit orders' regarding custody

10

and visitation upon terminating dependency jurisdiction over a child." (*Ibid.*; *In re Chantal S.* (1996) 13 Cal.4th 196, 202–203.) "These exit orders remain in effect until modified or terminated by a subsequent order of the superior court." (*J.M.*, *supra*, 89 Cal.App.5th at p. 112, citing § 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

" '[I]n making exit orders, the juvenile court must look at the best interests of the child.' " (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.) "The juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child." (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 201.) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . . Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' " (*J.M.*, *supra*, 89 Cal.App.5th at p. 112.)

On appeal, we review the juvenile court's decision to issue a custody order pursuant to section 362.4, subdivision (a) for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102.) Pursuant to this legal standard, we will not disturb the court's order unless an appellant demonstrates that it exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 [reviewing court cannot substitute its decision for that of the trial court when the facts can support more than one reasonable inference]; *In re N.M.* (2023) 88 Cal.App.5th 1090, 1094 [same].] " 'When applying the deferential abuse of discretion standard, "the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the

facts is reversible only if arbitrary and capricious." ' " (*In re Maya L.*, *supra*, at p. 102.)

*B. The Juvenile Court Did Not Abuse Its Discretion*

Father contends the court abused its discretion in awarding joint legal and physical custody of M.H. because there is "remarkably scant" support for the court's determination that shared custody was in M.H.'s best interests. Father points to mother's unresolved mental health issues, her insistence—despite any evidence—that father molested M.H., her continued inappropriate behavior in front of M.H., and her inability to communicate effectively with father and other important people in M.H.'s life, including his teacher and social worker.

Certainly, mother is not without her shortcomings. However, the issue is not who is the stronger or better parent. Rather, the focus is the best interests of M.H. (*In re Chantal S.*, *supra*, 13 Cal.4th at p. 206.) In determining whether the juvenile court abused its discretion, we will not second-guess its decision or reweigh the evidence. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.) The appropriate test is whether the court exceeded the bounds of reason. (*Ibid.*)

Viewing the totality of the circumstances, the juvenile court's decision was not " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' " (*J.M.*, *supra*, 89 Cal.App.5th at p. 113.) By the time the juvenile court issued its exit orders, many of the issues flagged by father had been—or were on the way to being—rectified. For example, in terms of communication, mother used an approved app to communicate with M.H.'s teacher. To the extent there is evidence suggesting that mother's mannerisms were "off-putting", making it difficult for people to interact with her, mother was also described as being "resourceful and determined" in knowing "how to acquire and

navigate community resources to meet the needs of her family." She was further described as a "hardworking, caring mother who" was a "fierce advocate and protector of her children."

While there is no denying that mother's unfounded belief that father had molested M.H. and the repeated invasive physical exams and forensic interviews were harmful to M.H., mother subsequently acknowledged she went about things the wrong way. She testified that she would not subject M.H. to such examinations should she suspect abuse in the future. Rather, she would direct her concerns to the appropriate authorities.

Father's resentment of mother for making unsubstantiated claims of sexual abuse is understandable. At this stage of these proceedings, however, the focus is not on reputational harm to father. To the extent father asserts mother "defamed" him to other parents at M.H.'s school, nothing in the record suggests M.H. was present.[4] That said, we look with considerable disfavor upon the fact that, as late as December 2024, mother purportedly called father a "molester" and "faggot" and threatened him with physical harm in front of M.H. Importantly, however, by the time of the contested hearing, mother readily conceded that she had no concerns for M.H.'s safety and wellbeing while in father's care. Also, she testified that she did not "[c]urrently . . . believe" that father "has molested [her] son".

By all accounts, at the time of the contested hearing, M.H. was a happy, fairly well-adjusted child, who not only was equally bonded with father and mother, but was doing well in school. M.H. was spending more than one third of his time with mother. The social worker testified that

---

[4]Although father states that mother told M.H.'s teacher that he "had done a lot of harm to the child", the teacher's testimony was that mother "said that he had done a lot to her."

based on the amount of time M.H. was spending with mother, both parents sharing joint physical custody of M.H. would not be a "material change" to the current visitation order. The social worker further testified that mother should also have legal custody to take him to a medical provider if needed while he was in her care. M.H.'s counsel, mother's counsel, and the social worker all agreed that the court should order joint physical and legal custody. M.H.'s counsel premised her recommendation on M.H.'s ability to verbally articulate what he wanted and his stated desire to spend more time with mother.

Finally, although mother had unresolved mental health issues and had not participated in the recommended psychiatric evaluation,[5] the record reflects that by the time the exit orders were contemplated, she had made significant strides in her case plan. She consistently participated in co-parenting classes and expressed a desire to work with father, despite their differences, for the sake of M.H. Mother was also not opposed to M.H.'s primary residence being with father because she recognized M.H. was thriving at his school.

All in all, the juvenile court did not abuse its discretion in determining joint legal and physical custody is in M.H.'s best interests and appropriate notwithstanding parents' issues with each other. There is no question that both parents love M.H. and want what is best for him. While co-parenting presents various challenges for father and mother, these challenges do not

---

[5] Father asserts that a psychiatric evaluation was a "requirement" of mother's case plan; the record, however, reflects mother was required to participate in a "Psychiatric/Psychological Examination." Mother underwent a psychological evaluation in May 2023. While further psychiatric evaluation was recommended, it was never required.

14

outweigh the benefits to M.H. of having both parents equally involved in his life.

## III.

## DISPOSITION

The juvenile court's orders are affirmed.

_____
Moorman, J.*

WE CONCUR:


_____
Streeter, Acting P. J.


_____
Goldman, J.


A173830/*In re M.H.*

---

* Judge of the Superior Court of California, County of Mendocino, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.