Filed 3/14/16  In re Noah Y. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re NOAH Y., a Person Coming Under the Juvenile Court Law. | |
| | D068986 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518803C) |
| v. | |
| JULIETTE F., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Juliette F. appeals the juvenile court's exit orders regarding custody and visitation under Welfare and Institutions Code section 362.4.[1]  She contends that the court failed to consider the totality of the circumstances and her son Noah Y.'s best interests when it granted sole legal and physical custody to Noah's father, Joshua Y., and visitation rights to her.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This is the second appeal filed by Juliette in Noah's dependency case.  Previously, this court affirmed the continued exercise of jurisdiction over Noah and his brothers at a January 2015 contested review hearing.  (*In re Jonathan M.* (June 2, 2015, D067309) [nonpub. opn.].)  We need provide only a condensed version of the facts here, for context.  Juliette is the mother of three sons, Jonathan M., Nathaniel M., and Noah, who are currently ages eight, seven, and two years old, respectively.  The two older boys have a different biological father from Noah.

An incident of domestic violence between Juliette and Joshua caused the San Diego County Health and Human Services Agency (the Agency) to first become involved in Noah's welfare.  In October 2013, Joshua came to Juliette's house to visit then-five-month-old Noah.  He and Juliette had an argument about financial support for Noah.  Juliette, who had been drinking, pushed Joshua and hit him in the face and head.  Joshua called the police.  Juliette screamed obscenities at the police and had to be fully restrained.  She was arrested for domestic violence and resisting arrest.  Juliette had been

---

[1]    Further statutory references are to the Welfare and Institutions Code.

emotionally and physically abused in the past, and she struggled with anger management issues, anxiety, and impulsivity.

In May 2014, the Agency reported that Juliette was consistently and diligently working on her protective issues, but was having a "very difficult time accepting the fact that she will have to [coparent] her [children] with their fathers for a very long time." Although Juliette loved and cared for her children, she was "coming across as very controlling and unwilling to [coparent]." For various reasons, including past childhood trauma, Juliette did not trust her children's fathers and had been interfering with their visits. The Agency noted that Noah had developed a bond with Joshua who, likewise, wanted to be fully and consistently involved in Noah's life.

By the January 2015 review hearing, which was the subject of Juliette's prior appeal, her issues with coparenting had not abated. Juliette's anxiety, suspicions, and accusations against Joshua of bad and/or neglectful behavior had put Noah at risk of emotional abuse. Juliette displayed disbelief when the juvenile court ordered her to attend a coparenting class with Joshua. The court continued dependency jurisdiction over Noah.

In June 2015, the Agency submitted a report recommending that the court terminate jurisdiction, while observing that the parents were still having "visitation issues." Juliette had not completed her individual therapy sessions and neither she nor Joshua had completed their coparenting classes. The court ordered the parties to attend mediation to address custody and visitation issues, with the understanding that both

3

Juliette and Joshua wanted the matter set for trial. The court also learned that Juliette wanted to move to Riverside so she could live near her family.

Juliette and Joshua were unable to resolve their visitation issues through mediation. Juliette had a strong desire to move to Riverside with all three of her children, and she wanted Joshua's visits with Noah to be reduced to two per month (from every weekend). During their currently ordered weekend "exchanges" of Noah, Juliette was struggling with timely drop-offs and pick ups.

In July 2015, the court held pretrial conferences, a large portion of which were spent discussing Juliette's move-away request. The court also found that Joshua had not made a prima facie showing on his section 388 motion that Noah should be removed from Juliette's care and placed with Joshua.

In late August 2015, the court held a contested review hearing (trial) to determine custody and visitation of Noah. Juliette was requesting joint legal custody, primary physical custody with her in Riverside, and that Joshua have visits with Noah every other weekend. Joshua, joined by Noah's counsel, requested joint legal custody, primary physical custody with him in San Diego, and that Juliette have visitation rights. The Agency took no position on the issue of primary physical custody. The court received the Agency's reports and other documents, including the curriculum vitae of social worker Alicia Macias-Godoy, in evidence. In addition, the court admitted text messages between Joshua and Juliette and heard testimony from both of them.

In summary, Joshua testified that there had been instances of Juliette dropping off Noah to their agreed-upon exchanges up to two hours late, with very little advance notice.

4

She had also failed to produce Noah on at least one occasion. Juliette and Joshua had a "very hostile" relationship, and the two communicated primarily through text messages. The text messages admitted in evidence represented a sample of "various threats" that Joshua received on a weekly basis from Juliette. The texts are mostly Juliette's incoherent rants about her and Joshua's ongoing disputes surrounding child support, and frequently feature offensive and/or vulgar language directed toward Joshua and his wife (e.g., "[B]oth of [you] disrespectful and scandalous fucks need some sense knocked into [you] . . . .").

Joshua testified that he wanted primary physical custody of Noah because he had observed, with the passage of time, that Juliette could not behave like a responsible adult, and he was concerned that Noah was being exposed to her "fit[s]." Joshua indicated that Juliette was prone to emotional disturbances and hysteria; indeed, during trial, she was repeatedly disruptive and seemingly unable to adhere to the court's and her own counsel's admonitions. Joshua was employed and maintained health insurance for his family. He accepted fault for not having completed a coparenting class, explaining that he worked full time, had young children to care for at night, and a pregnant wife. Joshua and Juliette had ongoing fights about child support.

Juliette's testimony related generally to the propriety of the various accusations she had made against the fathers of her children, the good care and environment she had provided for the children, and the reasons why she wanted to move to Riverside. Juliette stated that she worked from home for Mary Kay and her boyfriend's company. She believed that all of her actions thus far were justified based on being a protective mother.

Despite its irrelevancy at trial, she would find ways to interject the issue of child support. The court directly questioned Juliette about the children's schooling, the exchanges of Noah, and logistical issues pertaining to those exchanges. After closing arguments, the court announced that it would issue a tentative ruling on custody and visitation for Noah within a few weeks.

On September 10, 2015, Joshua's counsel reported that he had "new evidence" to present regarding visitation. At the request of Noah's counsel, the court ordered that trial would be reopened. Without having heard the new evidence, the court stated that its tentative ruling was to order a "50/50" joint legal and joint physical custody arrangement—Noah would be with Joshua four nights a week beginning on a Wednesday, with an exchange to happen on Sunday, and so forth. Further, the court contemplated a provision in its order that being more than a half hour late for an exchange would constitute a violation of the court order. The court set a date to receive additional trial evidence.

The new evidence related to Juliette's failure to produce Noah to Joshua for two September weekends in a row, in direct violation of court orders and the Agency's instructions. The court heard testimony and admitted additional documents, including recent text messages and an Agency report. On September 4, Joshua and Juliette were both at the La Mesa Police Department, where the exchange of Noah was supposed to happen. Juliette had earlier learned that Joshua's driver's license was suspended, and she refused to allow Noah to be driven by Joshua under the circumstances. A number of police officers were attending them, and Noah was present to observe Juliette's demand

that Joshua be "arrested and go to jail." Joshua suggested he could use public transportation. Further, he used his cell phone to take a photograph of all the police activity going on around them. Juliette was very upset that her children were recorded and/or photographed, and refused to let Joshua take Noah. Joshua testified that as he tried to get Noah, Juliette "reached her hands out and shoved [his] hands out of the way." Noah saw Joshua, and began crying and yelling for his father. The visit did not take place. Joshua explained that he had not known that his license was suspended; it had happened very recently due to his being in arrears on his child support obligations.

The next weekend, Juliette again refused to turn over Noah to Joshua. She did not produce Noah at the La Mesa Police Department and, without Agency approval, she insisted that Joshua drive to Riverside to pick up Noah. At the same time, Juliette knew that Joshua could not drive because his license was suspended, and she had previously refused to allow Joshua's wife to drive or be present at the exchanges. The visit did not occur.

Joshua believed that Juliette did not want him involved in Noah's life and that she would entirely stop his visits if she could. Because of Juliette's antipathy toward him, she was setting up "trap[s]" and causing hostile confrontations, which Joshua tried to avoid in order to prevent Noah from suffering emotional harm. Conversely, Joshua respected Juliette's rights as a mother. For her part, Juliette defended all of her actions as being those of a reasonably concerned parent. She stated that depriving Joshua of his visits with Noah might "help a lot" with getting Joshua to pay child support, but she did not actually believe that Joshua should not get visits.

7

Finally, the court heard testimony from the social worker assigned to Noah's case, Macias-Godoy. She testified that the Agency's position had changed, and that the Agency supported Noah's placement and primary residence with Joshua. Macias-Godoy believed that Juliette's ongoing interference with Joshua's visits had put Noah (as well as the two other children, who were present during the exchanges) at risk of emotional harm. Based on the last two missed visits, Macias-Godoy did not believe that Juliette would produce Noah for visits if the court terminated its jurisdiction. In contrast, Joshua had been responsibly and reliably returning Noah to Juliette after each of his visits. The Agency had no concerns about Joshua's interactions with, or ability to care for, Noah.

After considering all the evidence, the court departed from its tentative ruling and awarded Joshua sole legal and physical custody of Noah, with Juliette to have supervised visitation once a week for up to eight hours. The court stated that it was granting sole legal custody to Joshua because it did not believe that the parents could cooperate "in any way" on critical decisions involving medical care and school. The court found that all services offered by the Agency had been reasonable, but that Juliette could not overcome a "deep rooted . . . hatred" for Joshua and a perspective that she is "always right." The court was not concerned about either parent's ability to meet "basic safety standards," but it was clear to the court that Juliette could not abide by court orders and a shared custody schedule. The court discussed that Noah's placement with Joshua and supervised visits for Juliette would remove any risk of domestic violence and physical harm, which was the cause of Noah's dependency in the first place. Thus, the court could safely terminate jurisdiction.

8

DISCUSSION

Juliette contends that the juvenile court's exit orders constitutes an abuse of discretion. She argues that Noah's removal from her custody is not in his best interests, the court did not consider the totality of the circumstances, and eight-hour weekly supervised visits with her are not sufficient.

Section 362.4 provides that when the juvenile court terminates its jurisdiction over a dependent child, it may issue an order determining the custody of, or visitation with, the child. (§ 362.4.) The juvenile court makes "custody determinations based on the best interests of the child without any preferences or presumptions" regarding joint custody. (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712.) It looks at the totality of the child's circumstances. (*Ibid.*) The reason why a juvenile court, unlike a family court, does not presume joint custody is in the child's best interests is because the child has already been seriously endangered, abused, or neglected, and the juvenile court's central concern is protection of the child. (*Ibid.*; see *In re Chantal S.* (1996) 13 Cal.4th 196, 206 [approving *In re Jennifer R.*].) We review a juvenile court's custody and visitation orders for abuse of discretion. (*In re Maya L.* (2014) 232 Cal.App.4th 81, 102.)

We conclude that the juvenile court did not abuse its discretion in awarding sole legal and physical custody of Noah to Joshua and granting Juliette weekly eight-hour supervised visits. Noah became a dependent child in need of protection because of a violent confrontation between Juliette and Joshua over Joshua's visitation rights and child support issues. The hostility continued but was manageable due in large part to continuous third party oversight and Joshua's efforts to not allow Juliette to provoke him.

9

Recent events, however, showed that confrontations would continue absent the court's and Agency's involvement. Once the trial had ostensibly concluded, Juliette immediately disregarded the court's orders by unilaterally failing to produce Noah on two successive weekends. In addition, the record amply supports that, throughout Noah's dependency case, Juliette provoked arguments and confrontations. Thus, the court could rationally conclude that the parents were currently incapable of sharing custody of Noah without him being at risk of emotional harm and, further, that removal from Juliette was necessary to ensure that Noah would have a relationship with his father.

Juliette argues that the court erred in failing to consider her existing relationship with Noah. Based on our review of the record, the court considered a number of circumstances, including that both parents loved Noah, independently provided safe homes, and possessed sufficient parenting skills. The provision of basic care for Noah was not the protective issue. The issue throughout the case was that Juliette had not adequately learned how to coparent, and her failure in that regard was harming Noah. In and out of the courtroom, Juliette could not regulate her emotions and behave appropriately. In contrast, Joshua had shown that he would put Noah's needs first, could meet all of his child's needs, and would respect Juliette's visitation rights as ordered by the court.

Finally, the court did not abuse its discretion in ordering weekly eight-hour supervised visits for Juliette. "[A] determination that continuation of dependency is no longer required could well be premised on a custody and visitation order that contains protections that enable the court to alleviate continuing concerns that might otherwise

10

preclude the court from terminating its jurisdiction." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 270.) Noah's counsel had objected to a termination of jurisdiction, arguing that Noah was still at risk of harm. Notably, Noah had once again been caught in a fray between his parents on September 4 and, on this occasion, Juliette had not even been drinking alcohol. Prior to terminating its jurisdiction, the court specifically remarked that supervised visits for Juliette (and residing with Joshua) would eliminate any detriment to Noah. Given the animosity arising from the exchanges and Juliette's erratic conduct, it is unsurprising that the juvenile court would limit her visits to once a week with supervision. Based on the evidence presented, the juvenile court could reasonably conclude that its orders on custody and visitation were in Noah's best interests.

## DISPOSITION

The juvenile court's orders regarding custody and visitation are affirmed.


AARON, J.

WE CONCUR:


MCCONNELL, P. J.


HALLER, J.

11