Filed 9/30/20  In re Isabella H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Isabella H., a Person Coming Under the Juvenile Court Law. | |
| | D077340 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519883) |
| v. | |
| M.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Rohanee Zapanta, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Jesica N. Fellman, Deputy County Counsel, for Plaintiff and Respondent.

M.C. (Mother) appeals a juvenile court's custody and visitation order under Welfare and Institutions Code[1] section 362.4. The order granted sole legal custody of Mother's two-year-old daughter, Isabella H., to the child's father, Michael H. (Father). Mother argues that this "exit" order was not in Isabella's best interests and constituted an abuse of the court's discretion. We conclude the court did not abuse its discretion and accordingly, affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Prior to the instant case, in October 2013, one of Mother's children (Annette) tragically died. A clothes-filled dresser with a television on top tipped over and crushed the little girl while Mother was in another room. Law enforcement deemed the death an accident.

In late September 2017, Mother gave birth to Isabella. Father was present at the birth and acknowledged paternity. Mother and Father were not married or in a committed relationship. Not long after the baby's birth, the parents had several violent fights stemming from the fact that Father had another girlfriend. Father maintained relationships with both women, each one knew about the other, and Mother was very unhappy about the situation.[2]

In September 2018, 11-month-old Isabella was living in a mobile home with Mother, Father, and the paternal grandparents. One night, Father was out with his girlfriend, the paternal grandparents were in Mexico, and Mother was responsible for watching Isabella. Unknown to Mother, at about

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

[2] According to Father, he cheated on his girlfriend with Mother, thus conceiving Isabella. Father subsequently tried to maintain a relationship with Mother for the baby's sake.

10:00 p.m., the baby managed to crawl out of the home onto the porch, down a set of stairs, and reach the entrance of the mobile home park. There, a resident "slammed on [his or her vehicle's] brakes" to avoid contact, observed a baby in the road, and contacted law enforcement. Mother had no idea anything was amiss until an officer arrived at the home with Isabella. When questioned, Mother said she thought a relative in the house was watching the baby despite that she had not asked anyone for help.

The San Diego Health and Human Services Agency (Agency) began investigating the case, initially seeking the parents' voluntary compliance. However, Mother and Father tended to minimize the September incident. Several relatives thought Mother was depressed, or, still traumatized by her prior daughter's death. Mother presented with a flat, disengaged demeanor when conversing with social workers.

The Agency also learned that the parents' relationship was unhealthy, and they had a history of physical altercations. Father did not wish to be in a relationship with Mother anymore, but he also did not want her to be alone. She was at the time six months pregnant with another of Father's children and had a six-year-old son (Carlos) by a different man. Mother agreed with the Agency to move out of the family home but then failed to do so, and Father declined to go to family court for custody orders. The Agency believed that Isabella needed to be removed from Mother for the child's protection.

In October 2018, the Agency filed a petition on Isabella's behalf based on a substantial risk of serious physical harm due to Mother's inadequate supervision (§ 300, subd. (b).) The juvenile court detained the child with Father and ordered separate, supervised visits for Mother. She was ordered "not to spend the night or reside in the same home as the child" and "not to visit at the [family] home."

3

Following the detention hearing, an incident occurred where Mother found out that Father's girlfriend was visiting, Mother "showed up" at the home unannounced, and she refused to leave until paternal grandmother threatened to call the police. Mother left, and law enforcement advised paternal grandmother that she should obtain a restraining order. Mother intensely disliked and distrusted Father's girlfriend.

In December 2018, the juvenile court made a true finding on the petition and assumed dependency jurisdiction. The court ordered Isabella's placement with Father, family maintenance services for him, and reunification services for Mother, including supervised visits. Both parents were directed to comply with their case plans.

Over the next six months, the parents made a little progress on their case plans. Isabella was doing well in Father's care. When he was working, the paternal grandmother provided care. Mother was working and having positive supervised visits with Isabella but had barely begun individual therapy sessions.

Toward the end of the reporting period, another incident occurred at the home during which Mother broke a window and Father called police. That day, she had called him several times, but he was asleep and did not see the missed calls. Mother then "showed up" at the home and knocked on the door, wanting to take Isabella. Father walked away without saying a word, Mother tried to get his attention through a bedroom window, and she broke the window glass. The broken glass scared Isabella. Outside the house, Father tried to explain to Mother that he had already made plans with the child. The parents argued, and Mother refused to leave until Father called the police.

At the June 2019 review hearing, the court continued its dependency jurisdiction and Isabella's placement with Father. It set three and six month review hearings.

During the next three months, Father tried to comply with his case plan, but had trouble juggling program attendance and his work schedule. Father was able to remedy social workers' concerns about Isabella's unkempt appearance and the home's clutter. Mother maintained positive supervised visits with Isabella but struggled to consistently attend therapy sessions. At the September interim review hearing, the court again continued its jurisdiction and confirmed existing orders.

By the end of 2019, the Agency recommended the court's terminating jurisdiction and granting full legal and physical custody of Isabella to Father. He had completed his parenting classes and attended several CoDA[3] meetings. Father still had to follow through with taking Isabella to all her health-related appointments as well as enroll her in Head Start, but in the Agency's assessment, the child was no longer at risk of serious physical harm due to inadequate supervision. Isabella had been kept safe, and well monitored, by Father. For her part, Mother was making progress on her services and on the verge of gaining unsupervised visits with Isabella; the Agency merely wanted Mother to demonstrate consistent participation in individual therapy over time. Mother was helping to take Isabella to her appointments, accompanied by a supervising family member.

At the contested family maintenance review hearing in February 2020, the Agency continued to recommend termination of jurisdiction and granting sole legal and physical custody of Isabella to Father, while noting its support

---

[3]    CoDA, or Co-Dependents Anonymous, is a support group that assists participants in developing healthy relationships.

of unsupervised visits for Mother. Isabella's counsel (minor's counsel) wished to keep the case open, expressed concern over the parents' incomplete participation in services, and opposed unsupervised visitation. Mother's counsel requested that Mother receive joint legal custody of Isabella, so Mother could participate in decisions over the child's schooling and medical appointments.[4]

Based on the evidence and counsel's arguments, the juvenile court terminated its jurisdiction for reasons stated on the record, granted sole legal and physical custody of Isabella to Father, authorized unsupervised visits for Mother, and directed the custody/visitation order be forwarded to family court. The court discussed, "[a]s it relates to legal custody, I think that [Father] has had custody of Isabella and that his ability to keep custody of her and maintain her health and well-being without any actual risk presenting itself throughout the course of this case is a testament . . . that he would be able to provide a healthy and safe environment as the sole legal custodian . . . ." The court remarked that if Mother successfully progressed through unsupervised visits, then she "can go ahead and ask for or seek a different type of custodial status at some future date and time."

Mother's appeal followed.

DISCUSSION

Mother argues that the juvenile court's exit order granting sole legal custody of Isabella to Father was not in the child's best interests, and

---

[4]     Mother's counsel also argued that Mother was caring for Isabella while Father was at work, but we have not located any support in the record for this claim. To the contrary, the Agency's addendum report filed February 11, 2020, states that Father "reported that *his* mother cares for his daughter while he is at work." (Italics added.) It appears that *paternal grandmother* cared for Isabella when Father was working, which is consistent with the case history and the court's order for Mother to have supervised visits only.

6

therefore an abuse of the court's discretion.  The Agency responds that the order was well within the court's broad discretion considering all the circumstances, and, Mother has the option of petitioning a family court for joint legal custody in the future.  We conclude the court acted within its discretion.

*Guiding Principles*

When the juvenile court terminates dependency jurisdiction, it may issue a custody and visitation order.  (§ 362.4.)  Under section 362.4, the court has broad discretion to fashion custody and visitation orders, considering the totality of the child's circumstances and the best interests of the child.  (*In re Chantal S.* (1996) 13 Cal.4th 196, 206; *In re John W.* (1996) 41 Cal.App.4th 961, 973; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 31-32 (*Burgess*).)  A juvenile court custody and visitation order, commonly referred to as an "exit order," is enforceable in family court.  (*In re John W.*, *supra*, at p. 970; *In re Chantal S.*, *supra*, at p. 213.)

When making a custody determination, the juvenile court's focus and primary consideration is the best interests of the child.  (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268 (*Nicholas H.*).)  The juvenile court is not bound by any family court preferences or presumptions, e.g., a presumption of parental fitness.  (*Ibid.*, citing *In re Chantal S., supra*, 13 Cal.4th at p. 206.)  "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons. [Citation.]  By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is

7

relevant to, but not necessarily determinative of, the best interests of the child." (*Nicholas H., supra*, at p. 268.)

After the juvenile court has made an initial custody and visitation order, the noncustodial parent may seek to alter the order for legal and physical custody on a showing that there has been a substantial change of circumstances and that modification is essential to the child's welfare. (*Burgess, supra*, 13 Cal.4th at p. 37; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 14-15.) The changed circumstances rule provides that once the court has determined a particular custodial arrangement is in the best interests of the child, the court should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interests. The rule promotes "the dual goals of judicial economy and protecting stable custody arrangements." (*Burchard v. Garay* (1986) 42 Cal.3d 531, 535.)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Burgess, supra*, 13 Cal.4th at p. 32; *In re Maya L.* (2014) 232 Cal.App.4th 81, 102 ["We review a juvenile court's custody orders for abuse of discretion"].)

*Analysis*

Mother has not established an abuse of discretion by the juvenile court. One of the primary reasons the court felt comfortable terminating its jurisdiction was that Father had kept Isabella safe for well over a year and the court decided that, under his sole care and custody, dangers arising from

inadequate supervision were unlikely to recur. The initial protective issue was Mother's inadequate supervision, yet by the time of the last hearing, she had not begun unsupervised visits with Isabella. Particularly concerning to the Agency was that a previous child of Mother's had died under her watch. The court could reasonably vest sole legal and physical custody in Father to minimize the risk of serious physical harm to Isabella.[5] (See *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 713 [vesting sole legal and physical custody in father alleviated protective issues and was in child's best interests].)

In addition, joint legal custody[6] of the child would require a cooperative relationship between the parents, but on multiple occasions, Mother exhibited poor judgment and/or difficulty co-parenting with Father. There was an incident involving his girlfriend where Mother showed up uninvited at the house and declared her preference for Isabella to be in foster care rather than with Father. In another incident, Mother tried to take Isabella for a visit against Father's wishes and became destructive in the process. Mother was not always able to put Isabella's interests above her own. Under the circumstances, the juvenile court could reasonably conclude that Mother was not ready to share legal custody.

Mother argues she should have been granted joint legal custody because it would allow her to arrange for Isabella's health and educational

---

[5] Sole legal custody means that "one parent shall have the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3006.) Sole physical custody means that "a child shall reside with and be under the supervision of one parent, subject to the power of the court to order visitation." (Fam. Code, § 3007.)

[6] Joint legal custody means that "both parents shall share the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3003.)

needs where Father was struggling to follow through.[7] We are convinced the juvenile court considered Mother's point of view and believed, on balance, that it was in Isabella's best interest for Father to have sole decision making authority. Two-year-old Isabella was generally healthy and not yet of school age. Even if he had delayed, Father eventually set Isabella's dental appointment, for example, and arranged for Mother and the maternal aunt to take Isabella to the appointment.

Mother further argues she made substantial progress in overcoming the protective issues. The juvenile court apparently considered and agreed that Mother had made progress, thus authorizing her to begin unsupervised visits. Nevertheless, based on the totality of circumstances at the time of hearing, the court could reasonably determine that granting sole legal custody of Isabella to Father was in the child's best interests. "Should circumstances change in the future [Mother] is free to seek joint legal custody in the family law court." (*In re Jennifer R.*, *supra*, 14 Cal.App.4th at p. 714.)

---

[7] Mother also argues she was Isabella's "de facto primary caretaker." Although Mother's counsel made this argument at trial, we find no record support for the proposition that Mother was Isabella's primary caretaker during the pendency of the case. See footnote 4, *supra*.

DISPOSITION

The juvenile court's custody and visitation order is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


O'ROURKE, J.