Filed 8/28/24  In re Johnny O. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re JOHNNY O., Person Coming Under the Juvenile Court Law. | B330074 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP2025A) |
| Plaintiff and Respondent, | |
| v. | |
| B.O., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Jean M. Nelson and Anthony M. Trendacosta, Judges.  Affirmed.

James W. Tritt, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

Johnny O. (son, born 2022) was declared a dependent of the court following adjudication of a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) pursuant to Welfare and Institutions Code, section 300.[1]  The juvenile court found the violent conduct of son's mother, B.O. (mother), endangered his physical health and safety, created a detrimental home environment, and placed son at risk of serious physical harm.  When it terminated jurisdiction approximately seven months later, the juvenile court issued an exit order granting joint legal custody to mother and Johnny R. (father), physical custody to father, and unmonitored visitation (partial days, two or three times weekly) to mother.  Mother appeals the order terminating jurisdiction and the juvenile custody order.  We affirm.

## BACKGROUND

### A.    Referral and Detention

In the spring of 2022, DCFS received two referrals describing domestic violence that took place in the presence of son, then a newborn.  According to a police report, the earlier incident in March involved an argument between parents that

---

[1]    All statutory references in this opinion are to the Welfare and Institutions Code.

escalated to violence.  Mother lunged at father and scratched his face, leaving a visible mark, threw a plate that shattered on the wall next to him, and threw a mug, striking father in the thigh.  The second incident in April 2022 began when mother objected to paternal step-great-grandmother (grandmother) praying over son in a bedroom of the family home.  Mother yelled at grandmother using profanity, and when father stopped mother from entering the bedroom, mother grabbed father and scratched him.  Mother then obtained a cup of hot coffee from the kitchen, returned to the bedroom, and threw the coffee at father.  When police responded, mother admitted she had thrown coffee, but she denied touching father.  The officers, after observing father had a visible abrasion on his shoulder that corroborated his description of the altercation, arrested mother for intimate partner violence with injury.

During DCFS's investigation, father reported earlier instances of domestic violence—mother struck him on several occasions and swung a breast pump at him.  Grandmother reported she often overheard father tell mother in Spanish, "Do not hit me," and "Grandma[,] come here she is hitting me," and when grandmother opened the bedroom door, she saw mother stop in the act of hitting father.

DCFS filed a petition under section 300 alleging parents' violent altercations placed son at a risk of harm.  At the detention hearing, the juvenile court found son was a person described by section 300 based on evidence mother had been the primary aggressor in the April altercation, had not been "forthcoming as to how father ended up with scratches on his back," and had been the aggressor in earlier domestic violence incidents.  Son was removed from mother and released to father.  Mother was

3

allowed monitored visits, and DCFS was granted discretion to liberalize visitation.

## B.    Jurisdiction and Disposition

At the combined jurisdiction and disposition hearing in September 2022, the juvenile court sustained the petition as amended, finding mother's violent conduct endangered son's physical health and safety, created a detrimental home environment, and placed him at risk of serious physical harm. The court stated, "I don't find mother credible," noting she made inconsistent statements to the police and social worker about throwing coffee at father.[2]  The juvenile court found "mother's M.O." was that "when she gets angry, she starts throwing things."  Mother also "tries to scratch the father" and during the March altercation, gave him a "visible injury."  The court credited grandmother's description of mother as someone "who lashes out quickly and in really violent ways with the baby present in the room."

The juvenile court denied mother's request to release son to her under a home-of-parents order.  Mother, the court observed, had attended only five sessions of a 52-session domestic violence intervention program and had missed two sessions, and the provider described her participation as "unsatisfactory" due to

---

[2]    Mother changed her description of the April altercation several times during the dependency case.  After admitting to police she had thrown coffee at father, she told a DCFS investigator she had "bumped into furniture that had a cup of coffee on top of it and landed on father's leg."  At the jurisdiction and disposition hearing, mother (through her counsel) stated, "Father had spilled the coffee on himself . . . ."  Shortly before the final section 364 hearing, she admitted she threw coffee at father.

4

"lack of cooperation" and "poor attendance." The court detailed its concerns: mother had "real problems because she throws things. And this is a baby that can't get out of the way. It is not a 13-year-old who could lock herself in the bathroom, it is a baby that could get sprayed with boiling water or hit with a plate or hit with a coffee mug. Mother [19 years old] is just so young and immature that she doesn't know how to really negotiate, communicate, and deal with her own frustrations, so that child is not safe with her." The court found clear and convincing evidence of a "substantial danger to the baby if returned home to mother, and there are no reasonable means by which the baby's physical or emotional health can be protected without removing from mother."

The juvenile court struck the petition's allegations against father, finding his progress in alleviating the causes necessitating placement had been "substantial." Son was declared a dependent of the court and ordered removed from mother. Mother was granted visits a minimum of two to three times a week, a minimum of two to three hours per visit, with a DCFS-approved monitor in a DCFS-approved setting. DCFS again was authorized to liberalize visitation in its discretion. Father was ordered to receive services that included a support group for domestic violence victims and parenting classes. Mother was ordered to complete a domestic violence program for perpetrators, parenting classes, and individual counseling.

C.    **Section 364 Hearings**

In March 2023, DCFS reported having "difficult[y]" liberalizing mother's visitation. Father remained fearful of mother due to her past violence, and DCFS did "not believe that

5

[mother] ha[d] learned from her [domestic violence and parenting] programs and continue[d] to engage in the same behavior." Mother continued to "constantly" speak negatively about father and "appear[ed] focused on what father is doing wrong [rather] than on the overall well-being and safety of the child." Further, "[a]t no time during the service period has mother taken responsibility as the aggressor, and she continues to say she is a victim." DCFS recommended termination of jurisdiction with an exit order granting shared legal custody, sole physical custody to father, and unmonitored visits for mother.

An initial section 364 hearing was held in early March 2023 but was continued so DCFS could provide information on several matters: problems father was experiencing (vandalism to his truck and cancellation of WIC benefits without his knowledge), mother's readiness for unmonitored visits, mother's statements during therapy regarding her responsibility for domestic violence, mother's mentioning a move to Missouri, and the status of any criminal case arising from her arrest after the April 2022 coffee-throwing incident.

DCFS prepared a report before the continued hearing. Mother explained she had expressed an interest in moving to Missouri because all of her family lived there. Her criminal case, the City Attorney confirmed, had been resolved with no criminal charges filed but would remain open for five years. Mother denied vandalizing father's truck. As for domestic violence, mother told the social worker, "'Now I accept my errors, as a human we commit mistakes and I accept my mistakes. I accept that I'm an aggressor, but I only threw the coffee[,] but I did not put my hands on him. My mistakes have highly cost me by separating me from my child. This is a lecture life has given

me.'" However, mother's therapist reported mother "never spoke about her being an aggressor" during their sessions and instead "minimized the domestic violence . . . ."

Father attended the continued hearing by telephone; mother did not attend at all, but her counsel appeared. DCFS did not change its custody and visitation recommendation. The juvenile court terminated jurisdiction and ordered joint legal custody, sole physical custody to father, and unmonitored visits to mother on terms to be agreed upon in mediation. The court reasoned, "It seems to me that especially since mother is hoping to progress to overnight and weekends, the court can't make a home of parents order. . . ." The final visitation order allowed mother to have five-and-a-half hour visits with son on Tuesdays, Thursdays, and alternating Sundays, but no overnight visits.

## DISCUSSION

### A. Governing Law

Juvenile dependency proceedings are intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2, subd. (a).) Section 300, subdivision (b)(1) authorizes dependency jurisdiction whenever a child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of substance abuse or the failure or inability of the parent to adequately supervise or protect the child. (§ 300, subds. (b)(1)(A), (b)(1)(D).) In this case, mother does not challenge the jurisdiction or dispositional orders, only the orders issued when the court terminated its jurisdiction and awarded physical custody to father.

7

"Section 362.4 governs the termination of juvenile court jurisdiction and related orders." (*In re J.M.* (2023) 89 Cal.App.5th 95, 112 (*J.M.*).) "The statute authorizes a juvenile court to make 'exit orders' regarding custody and visitation upon terminating dependency jurisdiction over a child." (*Ibid.*; *In re Chantal S.* (1996) 13 Cal.4th 196, 202–203.) "These exit orders remain in effect until modified or terminated by a subsequent order of the superior court." (*J.M.*, *supra*, citing § 362.4, subd. (b); see also Cal. Rules of Court, rule 5.700.)

"'[I]n making exit orders, the juvenile court must look at the best interests of the child.'" (*J.M.*, *supra*, 89 Cal.App.5th at p. 12, quoting *In re John W.* (1996) 41 Cal.App.4th 961, 973.) "Because juvenile dependency proceedings arise when children are subject to or at risk of abuse or neglect, '[t]he presumption of parental fitness that underlies custody law in the family court just does not apply. . . .  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions.' [Citation.]" (*Ibid.*) "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) "By the same token, a finding that the parent from whom custody was removed no longer poses a risk of detriment or that the parent whose custody has been subject to supervision no longer requires supervision is relevant to, but not necessarily determinative of, the best interests of the child." (*Ibid.*)

The juvenile court has broad discretion to make custody orders when it terminates jurisdiction. (*J.M., supra*, 89 Cal.App.5th at p. 112.)  We review the juvenile court's exit orders for an abuse of that discretion. (*Id*. at p. 113.)  The juvenile court's decision will not be disturbed unless it has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Ibid.*)  We "'consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling.  [Citation.]  The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child.  [Citation.]  We are required to uphold the ruling if it is correct on any basis, regardless of whether it is the ground relied upon by the trial judge.  [Citation.]'" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; see *In re Maya L.* (2014) 232 Cal.App.4th 81, 102 [when applying the deferential abuse of discretion standard, juvenile court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious].)

**B.    The Juvenile Court Did Not Abuse its Discretion in Awarding Sole Physical Custody to Father**

Mother contends the juvenile court abused its discretion by "bas[ing] its decision on mother's visits not having been liberalized beyond unsupervised visits, rather than the totality of the circumstances . . . ."  She contends she addressed "the totality of the court's concerns" that had been expressed at the initial section 364 hearing, and the court did not "use a strict best

9

interest standard" in fashioning its exit order. We are not persuaded.

Although the juvenile court's explanation of the primary basis of its custody ruling was abbreviated, its logic was evident: the reasons supporting DCFS's refusal to liberalize mother's visitation were also grounds for denying her joint physical custody. Stated another way, as mother had not yet shown that overnight visits were salutary, it was not in the child's best interest to give her joint physical custody.

Substantial evidence supported the court's determination. Son was removed from mother because she lashed out when angry, had an "M.O." of throwing things at father when son was nearby, and failed to acknowledge her misconduct. Her initial participation in a batterer intervention program was "unsatisfactory." Mother's subsequent behavior did not persuade DCFS to liberalize her visitation to full-day or overnight visits. Even after mother completed domestic violence and parenting programs, mother's social worker and therapist both reported mother's failure to acknowledge her role as the aggressor, and the therapist reported mother minimized the domestic violence. In the month before the final hearing, mother was still blaming and disparaging father. While mother eventually stated she was the aggressor and admitted throwing coffee at father, she continued to deny putting her hands on him and expressed no remorse for injuring him or endangering son. Given this evidence, the juvenile court had reason to doubt mother had adequately mitigated the conditions that caused son's removal. (*See In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["'[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision'"].)

10

Further, contrary to Mother's contention, her failure to progress to overnight visits was not the sole basis for the custody order. The juvenile court also expressed concern that mother had allowed her new boyfriend—a person not approved by DCFS—to be present at visits with son. Father alleged the boyfriend confronted father during an exchange. Mother did not deny these allegations below, and in her briefs on appeal, has not addressed this evidence at all.

The juvenile court also had other reasons to find that granting physical custody to father was in the best interests of the child. The court had evidence of father's completing a parenting program where he fully participated with good attendance, son's "thriving" under father's care, and their development of a "positive bond." The parenting class provider reported father had "'learned to understand the child's needs'" and "'is a supportive and loving parent.'" Given the evidence in the record, we cannot conclude it was arbitrary, capricious, or patently absurd to award sole physical custody to father.

Mother's contentions on appeal are essentially a request for us to reweigh the evidence and reach a different outcome. Mother points to evidence indicating that she acknowledged her role as aggressor, criminal charges were not pending, she had no plans to move out of state, she denied setting father's truck on fire, and she complied with her case plan. As a reviewing court, we do not reweigh this evidence or revisit the juvenile court's credibility determinations. (*In re Maya L., supra,* 232 Cal.App.4th at p. 104, fn. 6, citing *In re Casey D.* (1999) 70 Cal.App.4th 38, 52–53.) It is apparent the juvenile court determined the evidence of mother's rehabilitation was less compelling and less credible than substantial evidence indicating

11

son's best interests were served by awarding sole physical custody to father.  We will not revisit this determination.

In sum, from the totality of the circumstances, a rational trier of fact could conclude that awarding sole physical custody to father advanced son's best interests.  (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.)  The juvenile court did not abuse its discretion in making the custody order.

### DISPOSITION

The juvenile court's order is affirmed.

MORI, J.

We concur:

CURREY, P. J.

COLLINS, J.