Filed 2/5/25  In re J.C. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re J.C. Jr., et al., Persons Coming Under the Juvenile Court Law. | B338908 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>C.F.,<br><br>    Defendant and Appellant,<br><br>    and,<br><br>J.C.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. 22CCJP00019A-B) |

APPEAL from an order of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Conditionally reversed and remanded with directions.

Elizabeth Klippi, under appointment by the Court of

Appeal, for Defendant and Appellant C.F.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant J.C.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

—————————————

J.C. (Father) appeals from a juvenile court order denying his petition under Welfare and Institutions Code[1] section 388 seeking reunification services for his children, J.C. Jr. and I.C. C.F. (Mother) (joined by Father) appeals from the order terminating their parental rights under section 366.26, but the parents' appeal is limited to the contention that the Los Angeles County Department of Children and Family Services (Department) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and the California Indian Child Welfare Act (§ 224 et seq.) (Cal-ICWA).  The Department concedes the ICWA error.  We affirm the order denying the section 388 petition, but we conditionally reverse the order terminating parental rights and remand for full compliance with ICWA's inquiry and notice provisions.

———————————

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Family History and Dependency Jurisdiction over the Children Under Section 300, Subdivisions (b)(1) and (j)*

When J.C. Jr. was born in 2017, he tested positive for benzodiazepine, and Mother tested positive for morphine, oxycodone, and benzodiazepine. In August 2017, the juvenile court ordered J.C. Jr. removed from Mother and placed with Father. When the court terminated jurisdiction in February 2018, it awarded Father sole physical custody of J.C. Jr. Mother had supervised visitation after failing to complete the court-ordered drug treatment, individual counseling, and psychiatric evaluation.

When I.C. was born in December 2021, he tested positive for cocaine and methadone. The Department filed a petition under section 300, subdivisions (b)(1) and (j), citing Mother's substance abuse and Father's failure to protect the children. The petition alleged Mother had a history of substance abuse and used cocaine and methadone during her pregnancy. A social worker at the hospital reported that Mother admitted to using Xanax and methadone.

The Department also alleged Father failed to protect the children by allowing Mother to live in the home and have unmonitored visits with J.C. Jr. in violation of the February 2018 exit order. Father acknowledged Mother's history of drug use but claimed he was unaware of any drug use during her pregnancy. After both parents submitted to drug testing, Father tested positive for marijuana and Mother tested positive for methadone.

At the jurisdiction and disposition hearing in March 2022, the juvenile court sustained the petition but struck the

3

allegations that Father failed to protect the children from Mother's substance abuse. The court removed the children from Mother and placed them with Father. The court ordered Mother to complete a drug program with random weekly testing and individual counseling. It also directed Father to complete a six-month drug and alcohol program and five consecutive clean drug tests and to participate in a family preservation program and Nar-Anon. The court ordered Mother's visitation to be supervised, specifying that Father could not supervise the visits.

B.    *The Supplemental Petition and Subsequent Termination of Father's Reunification Services*

In April 2022 the Department filed a section 387 supplemental petition alleging Father violated the March 2022 disposition orders by allowing Mother to have multiple visits with the children without a Department-approved monitor present. Even after the social worker warned both parents after the first incident that further unauthorized visits would result in a removal warrant, Father continued to take J.C. Jr. and, on at least one occasion, I.C. for such visits with Mother. J.C. Jr. said Father told him not to tell the social worker or he would be taken away. After initial denials and falsehoods, Father admitted he had taken J.C. Jr. to visit Mother and acknowledged he made a bad decision. The children were detained from Father and placed with paternal aunt A.Q.

Between April and June 2022, Father tested positive for marijuana six times. He missed two tests in June and July 2022 and tested positive for marijuana three times in July. In August 2022, Father tested negative twice and told a social worker he uses marijuana medicinally for pain and stress. During the same

4

period, Mother tested positive for alpha-hydroxy-alprazolam and methadone three times and missed two tests. Although she claimed to have a prescription for Ativan, she failed to provide proof. The Department investigators noted Mother had slowed, slurred speech and was incoherent at times.

In June 2022 the juvenile court sustained the supplemental petition, removed the children from Father's custody, and ordered family reunification services for both parents. Father was required to participate in individual counseling and random drug testing. Initially, he was permitted unsupervised visits but, in July 2022, after Father tested positive for cocaine and marijuana, the court ordered Father's visits be supervised.

In a December 2022 report, the Department noted the children appeared happy in their placement with A.Q. J.C. Jr. was attending therapy to address past trauma that left him with fears of being left alone and not having enough to eat. A.Q. reported that the parents had visited consistently for about a month and a half but then began visiting only two to three times per month. Their calls were also sporadic, sometimes weekly and sometimes not at all. By this time, Father was in partial compliance with his case plan. He was enrolled in drug testing but not individual counseling. He tested positive for marijuana four times in August 2022 and claimed to have a prescription for its use. Father missed a scheduled test in December. He denied being in a relationship with Mother, who was not compliant with her case plan.

In February 2023, the juvenile court ordered continued family reunification services for Father but terminated services for Mother.

By August 2023, the Department reported that both

parents' visits and phone calls had been minimal since the prior hearing. Father called the children 12 times between January and July 2023, with no calls in June, despite daily calls being scheduled. When he visited, Father helped J.C. Jr. with homework or shared meals with his children and was able to divide his time equally between them. But Father was not in compliance with his treatment programs and was limited in his cooperation with the Department. Father stated he worked seven days a week, which made compliance difficult. The parents acknowledged they had rekindled their relationship. Mother remained noncompliant with court-ordered programs and minimally cooperative with the Department.

At the 12-month review hearing in September 2023, the court terminated reunification services for Father and scheduled a section 366.26 permanency planning hearing. The section 366.26 hearing was initially set for December 2023 but was continued several times.

Father's visits became "less and less frequent" and his phone calls " 'minimal and random.' " In a March 2024 report, the Department noted that Father had three visits in December 2023, three in January 2024, and two in February 2024. In that period Father called the children two to four times a month. Father stated it was difficult for him to visit due to his and A.Q.'s work schedules. J.C. Jr. would get upset and cry when Father missed visits. J.C. Jr. said he liked to spend time with Father and felt sad when the visits ended.

During Father's visits with the children, interaction was limited because J.C. Jr. routinely would ask for Father's phone and then spend the visit focused on the phone while sitting on Father's lap. I.C. spent the visits happily running around the

6

park, but he did not interact much with Father and sought out A.Q. when he needed something. It was difficult for Father to supervise both children on his own, and he would rely on A.Q.'s help.

The children were affectionate towards A.Q. J.C. Jr. called her "tia" but also asked if he could call her "mom," while I.C. called her "mama." J.C. Jr. had been diagnosed with a developmental disability and was receiving services from the Regional Center, along with weekly therapy and an after-school tutoring program. A.Q. reported J.C. Jr. had a short attention span and required constant redirection and supervision. I.C., also a Regional Center client, received weekly occupational, developmental, and speech therapy. A.Q. reported he was very active and had difficulty going to sleep. The Department reported that A.Q. "continue[d] to ensure [I.C.] and [J.C. Jr.] receive[d] the services necessary to meet their special needs." A.Q. informed the parents about the children's needs, services, and medical appointments, but the parents did not participate in the services or appointments or ask for more information. A.Q. also relayed that I.C., who was still preverbal, was communicating with sign language, but the parents did not show interest in learning the signs he knew.

The Department recommended adoption by A.Q. as a permanent plan for the children. The Department assessed that the relationship between the children and their parents was not "of such significance that severing this relationship would cause the children significant emotional instability," and A.Q. provided stability, safety, and security that the parents could not.

7

C. *Father's Section 388 Petitions and the Termination of Parental Rights*

Father filed a section 388 petition requesting the juvenile court modify its September 2023 order and reinstate his family reunification services. Father declared he had been enrolled in counseling for over two months and in a six-month outpatient program for about six weeks. In the declaration, Father said, "I have finally acknowledged my co-dependency issue[s] with my children's mother and am working diligently to address them. My children are the most important people to me, and I firmly believe that we have an unbreakable bond." Father attached a letter confirming his outpatient treatment, which required a drug test, one group session, and three individual therapy sessions per week. Father also submitted a letter from his therapist, who stated Father had attended eight sessions; was very cooperative, motivated, eager to make changes; and "appear[ed] more insightful and aware of his codependency issues with his children's mother."

The juvenile court summarily denied Father's section 388 petition, finding no new evidence or changed circumstances and determining that reinstating services would not promote the children's best interests. The court noted Father had not completed his case plan or provided program letters confirming his progress.

In April 2024, A.Q. reported there had been no improvement in the quality of Father's visits. On one occasion, while speaking with J.C. Jr. on the phone, Father passed the phone to Mother. J.C. Jr. appeared upset and then regressed in behaviors such as being afraid of the dark, hiding food, and overeating.

That same month, Father filed a second section 388 petition reiterating his earlier assertions but adding details, including that on nine drug tests he had tested negative (except for marijuana on several occasions).  The court again summarily denied the petition.  The following day, Father submitted an "amended" petition, which was largely the same.  Although the court summarily denied that petition also, it ordered the Department to submit a response.

In its response, the Department recommended the denial of Father's section 388 petition, given Father's continuing codependent relationship with Mother and the children's need for continued stability with A.Q.  The Department reported that Father's visitation and phone calls were still inconsistent.  When asked about his visits with his father, J.C. Jr. said, "Me and my dad and [I.C.] play.  Daddy is nice to me and I.C.  I feel happy, and I want to go back to him (Father).  I want to live with Tia (Caregiver) too.  I want to live with them both.  Maybe my dad can be here too."  When asked whether he would live with Father or A.Q. if he had the choice, J.C. Jr. responded, "I don't know."  J.C. Jr. referred to his cousins as his brothers and sisters.  I.C. could not provide a meaningful statement but called A.Q. "mama" several times during a social worker's visit.

The Department reported that on May 1, 2024 A.Q. ran into Mother and Father together at a store.  A.Q. had heard Father and Mother were together "on a daily basis" and spending three nights a week together, and they "still [had] their issues."  However, Father told the Department that he and Mother were "taking a break" and were no longer living together, although he would occasionally bring Mother food when she asked him to.  Father said he used poor judgement in allowing Mother to move

in before I.C. was born.  Father admitted he saw Mother a few weeks earlier when they ran an errand together.  Paternal aunt Alice C., with whom Father lived, said Mother used to see Father once or twice a week, but Mother had not visited Father since October 2023.

In June 2024, the Department consulted Father's substance abuse counselor and his therapist.  The counselor reported Father consistently tested negative, had learned to manage stress better, was focused on trying to get his children back, and had "pretty much" completed his six-month program but continued to attend voluntarily.  The therapist noted Father had more confidence in setting boundaries with Mother, but still "need[ed] more work on setting boundaries with his co-dependent relationship" with Mother.  While Father "ha[d] improved a lot lately," the therapist stated Father "can still be naive sometimes."

Father refiled his section 388 petition on June 27, 2024 in order for it to be heard that same day as the section 366.26 hearing.  At the contested hearing, the Department and minor's counsel recommended the court deny Father's petition.  Minor's counsel indicated J.C. Jr. "specifically allowed me to share with the court while he does enjoy visits with Father, he wants to stay with [A.Q.] forever."

The juvenile court denied Father's petition.  The court was concerned about Father and Mother's continued relationship and found there was no change in circumstances.  The court emphasized the children had been out of the parents' care for two and a half years.  The court determined the children were "comfortable" in their current placement and concluded that reinstating reunification services was not in their best interests.

The court proceeded to the section 366.26 hearing and terminated the parents' parental rights.

Father and Mother both timely appealed.

## DISCUSSION

A.  *The Court Did Not Abuse Its Discretion by Denying Father's Section 388 Petitions Seeking Reunification Services*

1.  *Applicable law and standard of review*

"Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change of circumstance and demonstrates modification of the previous order is in the child's best interest.  [Citations.]  ' "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." [Citation.]  "[T]he change in circumstances must be substantial." ' " (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122, fn. omitted; see *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.)  "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309; *In re D.P.* (2023) 92 Cal.App.5th 1282, 1295 (*D.P.*); *In re J.M.*

11

(2020) 50 Cal.App.5th 833, 847.)

"We review a juvenile court's denial of a section 388 petition for abuse of discretion, and review its factual findings for substantial evidence.  [Citation.]  We may disturb the exercise of the court's discretion only when the court has made an unreasonable or arbitrary determination." (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 846; see *Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *D.P.*, *supra*, 92 Cal.App.5th at p. 1291.)  "We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court.  [Citation.]  We ask only whether the juvenile court abused its discretion with respect to the order it made." (*In re Matthew M.*, *supra*, 88 Cal.App.5th at p. 1195; see *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)

　　　2.　*Father did not show changed circumstances*

In arguing circumstances had changed, Father highlights his enrollment in a six-month outpatient program in February 2024, which he had completed by the hearing in May 2024. During the program, Father attended group and individual therapy three times a week, consistently tested negative for substances (except marijuana on a few occasions), made progress in managing stress, and continued attending voluntarily after completing the program.  He also began individual therapy in January 2024 to address his codependency issues with Mother.

Even assuming Father had made substantial progress in achieving lasting sobriety, "[n]ot every change in circumstance can justify modification of a prior order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)  Here, the chief issue leading to the removal of the children from Father was his codependent

12

relationship with Mother, whose addiction issues remained unresolved. Father's repeated violations of visitation orders and his dishonesty with the Department stemmed from these codependency issues. The juvenile court could reasonably conclude that if Father did not end his relationship with Mother, the children would remain at serious risk of harm.

While Father told the Department in mid-May 2024 that he and Mother were "taking a break," Father was seen with Mother and admitted he would still occasionally bring Mother food. In an April 2024 report, the Department noted that Father had passed the phone to Mother so she could speak to the children, which upset and confused J.C. Jr. Father's therapist confirmed Father still "needs more work on setting boundaries with his co-dependent relationship" with Mother and could "still be naive sometimes and gives the benefit of the doubt." The court thus did not abuse its discretion in finding Father had not shown a substantial change in circumstances with respect to his codependency issues. (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial."].)

     3.     *Father did not show that reunification would be in the children's best interests*

Father also has not demonstrated that the juvenile court abused its discretion in concluding that continuing reunification services was not in the children's best interests. At this stage in the case, a "primary consideration" was "the goal of assuring stability and continuity;" the focus had shifted from Father's "interest in the care, custody and companionship of the child[ren]" to that need for permanency and stability. (*Stephanie M., supra*, 7 Cal.4th at p. 317; see *In re J.C.* (2014)

226 Cal.App.4th 503, 527 ["[A]fter reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability."].)

Father failed to show how extending reunification services—beyond the 21 months he already received—would promote the children's need for permanence and stability. The evidence showed the opposite.

First, J.C. Jr. and I.C. required a high level of services for their developmental delays, and it was apparent A.Q. was better equipped than Father to ensure the children received the special attention necessary to meet their needs. Both children were Regional Center clients. J.C. Jr. had been diagnosed with a developmental disability and attended weekly therapy and an after-school program with tutoring. He had a short attention span and needed constant redirection and supervision. I.C. also received weekly occupational therapy, child development therapy, and speech therapy. The Department reported that A.Q. ensured the children attended all necessary services and addressed their needs.

By contrast, Father demonstrated a lack of engagement or ability to support the children's needs. A.Q. would tell the parents about the children's needs and services, including medical appointments, but the parents did not participate or inquire beyond what A.Q. shared. They also did not show an interest in learning basic sign language in order to communicate with I.C. When supervising both children, Father relied on A.Q. for assistance, highlighting his inability to manage their needs independently. The record supports the court's determination

14

that A.Q. could provide stability and tend to the children's needs, while Father could not. (See *Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319 [where the child had "special needs," the juvenile court did not abuse its discretion in "placing special weight on the child's need for stability"].)

Moreover, the children were in a "loving and stable placement" with A.Q., who had become a constant parental figure in their lives after caring for the children for over two years, since I.C. was three months old. (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 526; see *D.P.*, *supra*, 92 Cal.App.5th at p. 1295 [juvenile court properly focused on the " 'positive and secure attachments' " between the child and her foster family].) Reports consistently noted the children were happy, well-adjusted, and integrated into A.Q.'s family. J.C. Jr. asked A.Q. if he could call her "mom," and I.C. called her "mama." And J.C. Jr. considered his cousins his brothers and sisters.

Meanwhile, Father's visitation was inconsistent and increasingly infrequent. When the juvenile court terminated Father's reunification services in September 2023, it noted that his visitation had been "minimal, at best." His visitation subsequently remained sporadic and tapered off even more over time. Reports indicated Father failed to foster meaningful interactions during visits, often allowing J.C. Jr. to use his phone rather than engage with him. Although J.C. Jr. said he enjoyed spending time with Father and felt sad when he had to leave at the end of a visit, J.C. Jr. was detrimentally affected when Father did not show up for a visit. (See *In re J.T.* (2014) 228 Cal.App.4th 953, 965 [proposed change not in the children's best interest when children had lived with paternal grandmother for two years and mother had frequently failed to follow through

with scheduled visits].)

Given Father's minimal progress in addressing the children's needs, his inconsistent visitation, and the stability and care provided by A.Q., the juvenile court did not abuse its discretion in determining that continued reunification services were not in the children's best interests.

B.     *Conditional Reversal of the Order Terminating Parental Rights and Remand for ICWA Compliance Is Necessary*

Both Mother and Father argue, the Department concedes, and we agree that conditional reversal and remand is necessary because extended family members who may have meaningful information were not contacted regarding Indian ancestry.

1.     *Facts relevant to ICWA*

Mother has three brothers, including Joseph F. and Johnny A., and a great uncle, Moses A. Mother's mother, Anna Marie A., is deceased, as is her father, Lupillo F., who was from Mexico. Father has five sisters, including A.Q. and Alice, and four brothers, one of whom is deceased.

In the ICWA-010(A) forms attached to the original petition, the Department stated that neither Mother nor Father gave any indication that the children might have Indian ancestry. In December 2021, Father signed a form confirming he had no information about Indian ancestry. In ICWA-020 forms filed in January 2022, both parents denied Indian ancestry. At a hearing in January 2022, the juvenile court found no reason to believe ICWA applied. Mother and Father again denied Indian ancestry in May and June 2022. A.Q. and Alice also denied Indian ancestry.

In December 2023, Mother mentioned that she had heard of

16

possible Native American ancestry through her mother's side of the family but did not have any details. When asked if other relatives might have more information, Mother's grandmother, Victoria A., said there was some Native American ancestry but could not provide specifics. Mother gave the social worker her brother Johnny's phone number. When contacted, Johnny stated, "We are Native American; Navajo," and explained he was in the early stages of gathering information for his family tree. He added that their great-aunt, Lucille I., who had since passed away, had told him she was "documented as Navajo Indian." Johnny also mentioned that their mother, Anna Marie, had been adopted by Lucille. Father maintained that his family did not have Native American ancestry but stated Mother might have connections to the San Fernando Tataviam tribe. However, the Department determined the San Fernando Tataviam Band of Mission Indians was not a federally recognized tribe.

In January 2024, the Department investigator followed up with Johnny, asking for additional information about possible Native American ancestry and contact details for other maternal relatives. He reiterated that Lucille was "documented as Navajo Indian" and said he planned to meet with their uncle Moses in two weeks to obtain more information. A month later, the Department contacted Johnny again, but he had no new information. When the investigator asked Mother for Moses's contact information, she stated she would get back to the Department with his phone number. In March 2024, the Department investigator told Mother he had not heard from Moses, and Mother explained that Moses was dealing with a medical condition and was unable to contact the Department. The same month, as well as two months later, the Department

left Johnny voicemails seeking updates, but he did not respond.

At the section 366.26 hearing in June 2024, the court did not address ICWA.

2. *ICWA and the duty of inquiry*

"ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes and does not prohibit states from establishing higher standards." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*); see 25 U.S.C. §§ 1902, 1921; *In re T.R.* (2024) 107 Cal.App.5th 206, 206.) "[W]hen ICWA applies, 'the Indian child's tribe shall have a right to intervene at any point' in a proceeding involving the removal of an Indian child from their family." (*Dezi C.,* at p. 1129; see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8.) To ensure Indian tribes can exercise their rights in dependency proceedings, "[a]gencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*Dezi C.*, at pp. 1131-1132, quoting § 224.2, subd. (a).) Even if a court has already found ICWA does not apply, "the court 'shall reverse its determination if it subsequently receives information providing reason to believe that the child is an Indian child and order the social worker or probation officer to conduct further inquiry . . . .' (§ 224.2, subd. (i)(2).)" (*Dezi C.*, at p. 1134.)

The duty to inquire begins with a county's initial contact regarding a child, and "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be,

18

an Indian child." (§ 224.2, subd. (b)(2); see Cal. Rules of Court, rule 5.481(a)(1); *In re T.R.*, *supra*, 107 Cal.App.5th at p. 206.) ICWA and Cal-ICWA define "extended family member," if not separately defined by the law or custom of the tribe, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c) [providing "extended family member" follows the definition stated in ICWA].)

If the juvenile court or the Department has "reason to believe" that an Indian child is involved, "further inquiry" regarding the possible Indian status of the child is required. (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132; see § 224.2, subd. (e).) "The required further inquiry includes (1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs (BIA) and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe." (*Dezi C.*, at pp. 1132-1133; see § 224.2, subds. (e)(2)(A)-(C)); Cal. Rules of Court, rule 5.481(a)(4).) "At this stage, contact with a tribe 'shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of [ICWA] notices,' and 'sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case.' " (*Dezi C.*, at p. 1133; § 224.2, subd. (e)(2)(C).)

If the further inquiry "results in a reason to *know* the child is an Indian child, then the formal notice requirements of section

19

224.3 apply." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052; see 25 U.S.C. § 1912(a); § 224.3, subd. (a).)  A " 'reason to know' exists under any of the following circumstances:  '(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know [he or she] is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[; and] [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.' " (*Dezi C., supra,* 16 Cal.5th at p. 1133; see § 224.2, subd. (d).)

"[E]rror resulting in an inadequate initial Cal-ICWA inquiry requires conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3.  When a Cal-ICWA inquiry is inadequate, it is impossible to ascertain whether the agency's error is prejudicial.  [Citations.] '[U]ntil an agency conducts a proper initial inquiry and makes that information known, it is impossible to know what the inquiry might reveal.' " (*Dezi C., supra,* 16 Cal.5th at p. 1136.)

20

3. *Remand for ICWA compliance is necessary*

As the Department concedes, Johnny's statement that his great-aunt was "documented as Navajo Indian" was sufficient to give rise to a "reason to believe" the children were Indian children. This triggered a duty of further inquiry on the Department's part, requiring it to, among other duties, contact the Navajo tribe and share information necessary for the tribe to make a membership or eligibility determination. (§ 224.2, subd. (e); *Dezi C., supra,* 16 Cal.5th at p. 1132.) However, the Department did not contact the Navajo Tribe. Conceding error, the Department indicates it "has no objection to an order that it contact the tribe on remand."

Mother also contends the Department fell short in its initial inquiry duties by failing to contact six of Father's living siblings (his brothers and sisters other than Alice and A.Q.), the paternal grandparents, two of her three brothers, and her great-uncle Moses. The Department concedes it failed to satisfy its obligation to inquire of the known *paternal* relatives.[2] Regarding Mother's two brothers and Moses, the Department contends it made repeated unsuccessful efforts to obtain contact information from both Mother and Johnny. It appears the Department's efforts to obtain contact information for these maternal relatives

---

[2] The Department points out that Mother, not Father, contends the Department failed to contact the paternal grandparents, but there is no reference in the record to whether Father's parents are still living. On remand, the Department should inquire of Father or other paternal relatives whether the paternal grandparents are still living, and if so, make reasonable efforts to contact them.

were sufficient.  (See *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 ["[W]e cannot ask the agency to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided."].)  Nevertheless, the Department states that because the matter will be remanded, it has no objection to attempting to contact these relatives if contact information is provided.

Accordingly, we conditionally reverse the order terminating parental rights and remand the matter for the Department to fulfill its duties under ICWA and for the court to thereafter hold a hearing to determine anew whether ICWA applies.  (See *Dezi C.*, *supra*, 16 Cal.5th at p. 1137 ["Upon a conditional reversal, the Department will make additional inquiry and documentation efforts consistent with its duties and the court shall hold a hearing thereafter to determine whether, in light of the outcome of the inquiry as documented, ICWA applies."].)

## DISPOSITION

The court's June 27, 2024 order denying Father's section 388 petition is affirmed.  The court's June 2024 orders terminating Father's and Mother's parental rights are conditionally reversed.  We remand for the Department and the juvenile court to comply with the inquiry and notice provisions of ICWA and Cal-ICWA consistent with this opinion, including inquiring of family members and contacting the Navajo tribe.  If based on the completed inquiry, the juvenile court finds there is no reason to believe the children are Indian children, or if no tribe or agency determines the children are Indian children after notice has been provided pursuant to ICWA, the order terminating parental rights shall be reinstated.  If notices are

22

sent and the juvenile court receives a response from a tribe determining the children are Indian children, the juvenile court shall proceed in accordance with ICWA.

STONE, J.

We concur:

MARTINEZ, P. J.

SEGAL, J.